**TEXAS ELECTRIC RY. CO. v. EASTUS, U. S. Atty.**

**SAME v. THOMAS, Collector of Internal Revenue.**

Nos. 3662, 3663.

District Court, N. D. Texas, Dallas Division.
Dec. 29, 1938.

C. D. Cass and Robert E. Quirk, both of Washington, D. C., and J. M. Burford, of Dallas, Tex., for plaintiff.

John A. Erhard, Asst. U. S. Atty., of Dallas, Tex., D. W. Knowlton, Counsel, Interstate Commerce Commission, of Washington, D. C., Leo F. Tierney, Sp. Asst. to Atty. Gen., and Robert L. Stern, Sp. Atty., of Washington, D. C., for defendants.

Before HUTCHESON, Circuit Judge and ATWELL and DAVIDSON, District Judges.

ATWELL, District Judge.

By these two bills the complainant seeks to avoid certain provisions of the Labor Board Act and of the Tax Act, Act Aug. 29, 1935, 49 Stat. 974.

It alleges in each bill, that it operates interurban lines between Dallas and Waco, Texas, Dallas and Corsicana, Texas, Dallas and Denison, Texas, and street lines within the cities of Waco, Corsicana, Waxahachie, Denison, Sherman and McKinney. That it is a true electric interurban system, within the provisions of Section 1 of the Railway Labor Act, 45 U.S.C.A. § 151, and that as such, it is exempt from any and all of the provisions thereof. That it is a typical electric interurban railway, constructed and being used for passenger service, which has merely developed, in addition, such freight traffic as can be undertaken without interference with the performance of its main purpose, viz., the transportation of passengers and express. That its purely local traffic in freight, passengers, baggage and express greatly preponderates over any and all traffic, interline or interstate. That it is not operating as a part of a general railroad system of transportation.

That it is not subject to the Tax Act, Act Aug. 29, 1935, 49 Stat. 974, nor to the Railway Labor Act, 45 U.S.C.A. § 151 et seq., but that in each of such Acts, while its activities and corpus are exempted, there is a provision that the Interstate Commerce Commission may, upon complaint of any party interested, determine whether any line operated by electric power falls within the terms of such exempting proviso.

That Section 2 of the Tax Act, 49 Stat. 975, provides for the levy and collection and payment upon the income of every employee of a carrier subject to the Act, of three and one-half percent of the compensation of such employee, not in excess of $300 per month, received by him after the effective date of the Act, which was March 1st, 1936. That such tax shall be collected by the carrier or employer of the tax payer by deducting the amount from the compensation of the employee and that the employer is liable for the payment of the same. That, in addition, the carrier when subject to the Act, shall pay an excise tax of three and one-half percent of the compensation. That such collection shall be made by the Commissioner of Internal Revenue and paid into the treasury of the United States. That such collections and payments shall be made quarterly. That the Act provides punishment by fine of not less than $1,000 nor more than $20,000, such misdemeanors covering failures to return, keep records and supply information, in addition to the willful failure to pay or make return. Imprisonment may be fixed in addition to the fines, together with the costs of prosecution. That the real purpose of the Act is not to obtain funds for public purpose but to set up a pension or retirement system for employees.

That complainant has not complied with the provisions of the Tax Act for the reason that it is not subject thereto, and that its legal remedy, after payment, is so hedged about by regulations as to be neither full, complete nor adequate. That the respondents are charged with the duty of prosecuting both civil and criminal actions and that they are threatening to, and will, enforce such statutes unless restrained.

That the Railway Labor Act provides certain activities by those subject to its provisions, among which is the posting of a notice that all employees, in case of disputes between them and the carrier, will be handled in accordance with that Act. That it is not subject to the Act and cannot admit such subjugation by posting such notices. That if it were to take that course it would be deprived of its liberty of contract and would be compelled to negotiate with its employees through representatives other than of its own choosing. That applica-

tions have already been made for increase in wages and that complainant is unable to grant any such increase or to agree to rules and working conditions that have been demanded of it. That if disputes arise between it and its employees, and it were subject to the Act, such disputes must be submitted to the National Railroad Adjustment Boards, in the choice of which the complainant has had no part. That if it refuses to comply with such order it is liable to criminal prosecution with resultant heavy fines whereby it would suffer irreparable injury and damage.

That the respondent Eastus is United States Attorney and is charged under the law with filing such suits as come within the purview of the Act and has, in fact, threatened to file such suits against plaintiff and its agents and its officers for failure to comply with such Railway Labor Act.

Both bills ask for adjudication and declaration pursuant to the provisions of the Declaratory Judgment Act, Jud.Code § 274d, 28 U.S.C.A. § 400, to the effect that it is not subject either to the Tax Act or to the Railway Labor Act, and for a finding that the Act is unconstitutional, and for general orders of restraint.

These cases were tried before us in June. At the request of all parties, our decision was delayed until the Supreme Court should act in the Shields v. Utah Idaho Central Railroad Company Case, 59 S.Ct. 160, 83 L.Ed. ——. The opinion in that case was handed down on December fifth.

■ After that, the plaintiff asked permission to file an amendment, which conformed its pleadings, more carefully, to the facts. This amendment is granted. It also sought to withdraw a constitutional question which it had raised, and which was responsible for the assembling of the statutory three-judge court. This amendment is denied. Jurisdiction may not be defeated, after once tendered, and accepted, and the issue tried and rests in the breast of the court, by voluntarily abandoning that portion of the case which is responsible for the jurisdiction, the trial, and the proceedings.

Section 41 (28), Title 28 U.S.C.A., page 652, gives this court jurisdiction of cases brought to enjoin, set aside, annul, or suspend in whole or in part, any order of the Interstate Commerce Commission.

Section 46 of the same title, page 656, provides that such suits shall be brought against the United States and that the court in its discretion may sustain or suspend in whole or in part, the operation of the Commission's order pending the final hearing and the determination of the suit.

Section 47 of the same title, U.S.C.A., page 663, provides for the hearing in the District Court by three judges.

In the case of Shannahan v. United States, 303 U.S. 596, 58 S.Ct. 732, 82 L. Ed. 1039, the proviso of the Railway Labor Act, pleaded here, was under scrutiny. The Interstate Commerce Commission had determined that the electric line there treated was not within the meaning of the exempting proviso. It was also held that no "order" followed that finding by the Commission.

Trustees of a court reorganization proceeding moved to set aside the finding of the Commission. The Commission intervened, claiming that no "order" had been issued within the meaning of the Urgent Deficiencies Act. That contention was sustained by the lower court and affirmed by the Supreme Court.

It was also held that the function of the Commission was limited to the determination of a fact that its decision was not even in form an "order."

It was further determined that the finding by the Commission was not even a decision which the Mediation Board was empowered to enforce. The Act confers upon the Board possible duties in respect to interstate carriers by railroads not exempted by the proviso.

The opinion concludes with this statement [page 735], "Whether the determination of the Commission is reviewable in a district court by some judicial procedure other than that of the Urgent Deficiencies Act we have no occasion to consider."

The pleadings here disclose no "order" by the Commission, though, the Commission has intervened.

■ It must be conceded that there is a controversy here. It also must be conceded that the controversy arises under the national laws. Jurisdiction is, therefore, present in this court so far as the subject matter is concerned. Whether the court may be called upon to perform a service which the congress has committed to the Interstate Commerce Commission is open for serious thought.

In Hudson & Manhattan Railway Company against Hardy, D.C., 22 F.Supp. 105,

Judge Woolsey held that a suit to enjoin enforcement of an order of the Mediation Board, made under the Labor Act, was within the jurisdiction of the District Court and not one requiring three judges, because the constitutionality was not raised. In the present case the constitutionality of the legislation is raised. Also, in that case the Interstate Commerce Commission had found the railway to be subject to the Railway Labor Act.

■ Whether an electric railway is or is not an interurban electric railway not operating as a part of a general steam railroad system of transportation, is initially a question of fact, and when a finding on such question has been made by the Interstate Commerce Commission, in an order, and is embodied in an order of the Mediation Board, under the Railway Labor Act, it involves the determination of a question of administrative jurisdiction reviewable by the court in an action to enjoin enforcement of the order.

Referring to the Declaratory Judgment statute, which is also invoked here, we simply say that we need not consider whether relief could or should be granted under that Act, for under the general equity power we act to determine whether there was a proper hearing and decision by the Commission.

The Interstate Commerce Commission decided on March 16th, 1935, out of a submission to it on January 16th of that same year, that the Texas Electric Railway was not a street interurban or suburban electric railway within the meaning of the exemption proviso in the first paragraph of Section 1 of the Railway Labor Act, as amended June 21st, 1934, 45 U.S.C.A. § 151.

The decision is based on the conclusion that the Texas Electric lines may have been an interurban originally, but that it has lost its distinctive character as such, by the change in its business.

The changes to which it refers, are— that its combined revenues from freight, express and mail, in 1933 amounted to $338,-853. This exceeded the revenue of $239,-315 from the so-called interurban passengers and it almost equaled the total passenger revenue of $388,745.00.

Those figures were the only available ones at the time of that hearing. The present hearing shows even larger freight revenues and smaller passenger receipts, if the testimony were admissible.

It also observed that the Texas Electric is now engaged in the general transportation of freight like any other railroad, handles a considerable amount thereof in standard equipment hauled by electric locomotives, freely interchanges same with the steam railroads for movement to or from points throughout the country, maintains off-line traffic solicitors at distant points and participates as an intermediate carrier as well as an origin and destination carrier in through routes and joint rates with the steam railroads. It then concludes with this statement, "All of this cannot be merely incidental to the passenger service and it is doubtful whether the carrier could continue operation without the freight traffic."

The Commission stated further, "We are of the opinion that an electric railway which is engaged in the general transportation of freight, whether the revenue therefrom is greater or less than its passenger revenue, which handles the bulk of such freight in standard equipment similar to that used by the steam railroads, which freely interchanges the same with the steam railroads for transportation to or from points on their lines, a considerable portion thereof being handled in interstate or foreign commerce and which participates in joint rates with the steam railroads for interstate transportation has more of the characteristics of a commercial railroad operated by electric power than of an interurban as that term is used in the exemption provision under consideration."

It is patent, therefore, that the physical characteristics of the lines themselves were given little weight by the commission. The testimony seems to indicate that the rails are lighter, the bridges less secure, the roadbed itself much more fragile, some curves have such acuteness as to prevent more than one car being handled, the terminals being inaccessible to freight cars, the franchises of the cities and towns, as well as the regulations of the company itself, preventing such freight service except during the quiet hours of the night, the continued pandering for passenger business, and the large number of stops, both in towns and in the country, seem to merit careful consideration in determining "the nature of the critter."

The references to the physical characteristics of complainant's lines are that the freight is handled in standard equipment of the steam railroads; the carrier has four self-propelled work cars which are used to haul freight cars when needed; the

locomotives can draw trains of ten loaded freight cars and the work cars can draw up to eight loaded freight cars; the freight trains operate principally at night because of city franchise restrictions; it has acquired three electric locomotives and a few freight cars; erected freight platforms at its stations; constructed interchange tracks, lengthened sidings, reduced curves and made other improvements at a total cost of $285,441.00 since 1928; the stations which are generally of brick construction are used for all classes of service except at Dallas, Sherman, Waco and Corsicana where freight and express terminals are maintained separate from the passenger stations; it has sixteen interchange connections with six steam railroads and others are reached through intermediate switching, separate express and baggage trains are operated which handle the bulk of the express but a preferred service is handled on the passenger cars; approximately ten percent of the express is transported in standard freight cars which are interchanged with steam railroads; all of the express traffic is subject to store-door pickup and delivery service without additional charge; the lines of the carrier were originally constructed for passenger and express service only; carriers' tracks are of standard gauge and laid with seventy to eighty-pound rails; the grades range up to a maximum of two percent, and the minimum radius of the curves is fifty feet; because of insufficient clearance between the tracks standard freight cars cannot be set at some of the stations but this does not mean that they may not be set on team tracks, or in the yards; freight trains cannot be moved over the tracks used by the passenger cars through the city of Dallas, and such trains moving from or to the Denison line are switched over steam railroads in Dallas; the lines from Dallas to Denison and Corsicana closely parallel those of the Texas and New Orleans Railroad Company and part of the Southern Pacific system; the line from Dallas to Waco closely parallels the line of M. K. & T. Railway Company of Texas; there are other lines between the same points but they are not so close as those above mentioned, which are generally within sight of the Texas Electric and to a large extent separated only by a fence.

The failure of the Commission to specifically mention the fact that the bridges are less secure, the roadbed itself more fragile, and the acuteness of the curves, if not included in some of the general observations, are scarcely sufficient to support the charge that the Commission "arbitrarily and capriciously" ignored such facts. The statement that the rails weigh seventy to eighty pounds, would indicate their lightness in comparison to regular railway rails. Curves are mentioned but in a rather insignificant manner, which leaves bridges and roadbed apparently overlooked.

To use the absence of these two characteristics as a basis for setting aside the finding of the Commission, would be to give an unusual weight to the physical characteristics. It is possible that those two characteristics were not stressed at the hearing before the Commission and even if they were stressed, it is not necessary that the Commission include every characteristic in its opinion. A fair, full rating of what the Commission has written, leaves little ground to support the charge of capriciousness or arbitrariness, or, for that matter, a charge that the finding is not supported by testimony.

The ordinary significance of the word "interurban" is not helpful. Even steam railways are connections between urban centers.

Under the proviso of the Act, which excludes from the term "carrier," any street, interurban, or suburban electric railway, "unless such railway is operating as a part of a general steam-railroad system of transportation," there is no reference to the physical properties of the railway. If a suburban or interurban railway, is a part of a "general steam-railroad system of transportation," then it is not excluded under the proviso, and is included in the term "carrier" which is made subject to the Act. Hence, the fact that an interurban has a less safe roadbed and lighter bridge structures, may not be helpful. A railway might engage in interstate traffic and be a "part of a general steam-railroad system of transportation" and be wholly, or at least partially, unfitted for the safety of such operations and not be an interurban. Equipment and roadbed might be ordinary and not the best.

■ Nor is there in the exempting proviso, any definition of the phrase, "a part of a general steam-railroad system of transportation." We must seek a definition of this phrase from and in a construction of the Act. It was directed at interstate carriers. It could not mean and does not mean that in order to be a part of such a system of transportation there must be some stock, or, economic connection, or, owner-

ship. The condition must be physical—an actual fact. If it were not an actual physical fact, there could be no uninterrupted interstate carriage. Physical connection allows movement of freight by one system— the system which joins the two carriers physically. Thus, an interurban, even though its equipment may be lighter, which, in its ordinary course of business, is so connected by a rail plan as to permit cars of freight in large quantities and not in sporadic instances, to pass from steam transportation systems, to and upon its own rails, for carriage and transportation, must be considered to be outside of the proviso.

It is possible that there should be read in connection with such construction, the thought that freight so passing, has no direct connection with the passenger business —is independent thereof, and a separate and distinct line of endeavor. That seems to be what the facts of the present case disclose.

In the opinion of the Interstate Commerce Commission, there is a quotation, which gives a description of street interurban, or suburban railway, taken from Ex parte No. 38, 122 I.C.C. 414, which is rather appropriate:

"It is well known that electric cars were at first confined to street service in cities and towns. Gradually the lines were extended to the suburbs. Next came the idea of extending the lines from city to city. These three steps gave rise to the terms street, suburban, and interurban electric railways. These lines were limited almost exclusively to carriage of passengers. They were built largely upon streets and public highways. The only material difference between street, suburban, and interurban lines was the extent of the lines. If the line extended from city to city it was termed an interurban although handling the same traffic and being operated in substantially the same manner as the street or suburban line. We think this is the usual conception of the interurban line to-day."

"Obviously the character of the lines may change without a change in the name of the operating company. The record here shows that the name of a carrier, whether it is called a railroad, traction system, interurban railway, or power and light company, indicates nothing as to the character of the line or the nature of the traffic handled. We must look to the substance of the matter. A line which today extends only between two cities, and

is dependent upon passenger traffic for the bulk of its revenues, might properly be termed an interurban line. In a period of years it might through natural development or consolidation become a railway comparable with our steam railroads and still retain its original name. It would no longer, however, be an interurban railway in substance and in fact. There would be a point, although not definitely defined, where the line passed beyond the true interurban."

The proviso of Section 1, 45 U.S.C.A. § 151, specifically says, that, "The term 'carrier' shall not include any street, interurban, or suburban electric railway, unless such railway is operating as a part of a general steam-railroad system of transportation."

We do not think that the phrase, "operating as a part" necessarily means to include ownership, nor do we think that an interurban which receives and which delivers, according to its trade success, cars of freight to an entirely independent steam railroad system, is necessarily, thereby, "operating as a part of such system."

The crux of the question is just at that point. It may be that the disappearance of passenger business, by reason of the prevalence of the automobile and the consequent effort of Texas Electric to save itself from destruction, by securing freight business, has robbed it of its status as an interurban, because it has now become an active, effective link in a system of transportation, whereby freight in large quantities moves into and out of Texas.

A case similar to this, originated in the Tenth Circuit, styled Shields et al. v. Utah Idaho Central Railroad Company. The road had operated for approximately twenty years as an interurban with termini at Ogden, Utah, and Preston, Idaho, and being ninety-five miles in length, with two short branches.

The Interstate Commerce Commission found that it was subject to the Act. It went into the District Court and that court reviewed the evidence that had been offered before the Commission and allowed some additional testimony, though, the testimony in court and before the Commission seems to be about the same. The District Court held that it was not subject to the Act and its decision was af-

firmed, by the Circuit Court of Appeals. 95 F.2d 911.

In the opinion of the majority of the court there is a mention of the Commission's determination being controlling unless made arbitrarily, but there is nothing in the opinion to point out any arbitrary or unreasonable action.

In the dissenting opinion it is stated that the finding of the Commission was neither arbitrary nor capricious, nor was it made without any substantial evidence to support it. That case went to the Supreme Court and was reversed, 59 S.Ct. 160, 83 L.Ed ——, December 5, 1938.

■ Under an autonomy such as is set up by the Act and the controlling decisions prior and after, the scope of a judicial review of a finding by the Commission is simply whether the Commission acted within its authority. Shields v. Utah Idaho Central Railroad Company, 59 S.Ct. 160, 83 L.Ed. ——, December 5, 1938; Interstate Commerce Commission v. Union Pacific, 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308; Interstate Commerce Commission v. L. & N. R. R. Co., 227 U. S. 88, 33 S.Ct. 185, 57 L.Ed. 431; Virginian Ry. Co. v. United States, 272 U. S. 658, 47 S.Ct. 222, 71 L.Ed. 463; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033.

In the first case cited, it is stated [page 165], "The condition which Congress imposed was that the Commission should make its determination after hearing. There is no question that the Commission did give a hearing. Respondent appeared and the evidence which it offered was received and considered. The sole remaining question would be whether the Commission in arriving at its determination departed from the applicable rules of law and whether its finding had a basis in substantial evidence or was arbitrary and capricious. That question must be determined upon the evidence produced before the Commission."

■ The opinion of the Commission in the instant case, which was offered in evidence, shows a careful analysis of the testimony, a thoughtful weighing of the same, and an accurate application of the law to such facts.

■ It was acting within the field committed to it by the Congress, and in the absence of an "arbitrary or capricious" conclusion, its determination is binding.

In 1934, the Act was so amended as to prescribe that the Interstate Commerce Commission is authorized and directed, upon the request of the Mediation Board, or upon the complaint of any party interested, to determine, after hearing, whether any line operated by electric power, falls within the terms of the proviso.

It will be noted the amendment includes the phrase, "after hearing." The hearing was had in the instant case and the finding thereon seems to be devoid of the objectionable features which would render it susceptible of being set aside by a court.

The opinions in Piedmont & N. R. Co. v. Interstate Commerce Comm., 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115, and United States v. Chicago North Shore & Milwaukee, 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583, were rendered prior to this amendment. The electric railroad in the Piedmont Case, was determined to be, not "an interurban electric railway." [page 543.] The facts there show that the road carried its passengers in cars housing their own motors, connected with street railway systems in different cities, the trackage, except in small part, being outside of the cities, on private rights-of-way, and whose freight cars were of standard types and drawn in long trains by powerful electric locomotives; whose business was pre-eminently interchange freight business, national in character, and in all essential respects conducted like the freight business of steam railroads in the territory served.

The Chicago North Shore Case, shows an independent electric railroad, built and equipped primarily for interurban and suburban passenger service, whose traffic was mainly of that character, but which interchanged passengers and freight with steam railroads, competing with them, the freight business being, however, subsidiary in amount and function and not fairly comparable to the ordinary freight business of a steam railroad; was held to be "an interurban electric railway." [page 248.] In that case the court assumed the question to be doubtful, but acted in accordance with the custom of the Interstate Commerce Commission, to resolve doubt in favor of the carrier, and the carrier having issued large amounts of bonds in reliance upon this administrative construction, and, with-

out any objection from the Commission, it seemed to have a strong position in equity.

One cannot very well say that the Supreme Court, in the latter case, would have overturned a finding by the Commission that the road was not entitled to the proviso, had the Commission acted under the congressional authority given in 1934.

The colloquy of Congressmen at the time of the passing of the 1926 Act, 44 Stat. 577, 45 U.S.C.A. § 151 et seq., is not even persuasive, because the Congress thereafter allowed the Act to remain as it was, and deliberately committed the determination of the question to the Interstate Commerce Commission.

What happens in committee at the time of the passage of an Act, is frequently helpful in construction, but when the court is left without any satisfactory ground upon which to declare a right to construe, the rule ceases. The fact, the big, insurmountable fact, in this legislation, is that the Congress committed the determination of the question as to whether a carrier is included in the Act, to the Interstate Commerce Commission. This determination must be done "after a hearing." The courts may not overturn what the Commission does at such hearing, unless it is disclosed that arbitrariness or capriciousness, or a lack of evidence, is patent.

Plaintiff seems to center its case, upon what we think, are unfounded assumptions; viz., that because the 1934 amendment was an addition to and not a change of language already in the Act, the Commission, in the hearing provided for, was bound by the particular formulas, or theories, developed in decisions before the amendment; and that those formulas made the determining factor, whether passenger or freight business preponderates. We think this reasoning would emasculate the amendment. The amendment gave the Commission power to determine, after hearing, whether any line operated by electric power falls within the proviso. It did not fix the process by which that should be determined. It left that to the Commission, provided only they were reasonable, and in accordance with the statute.

The fact, and it appears to be such, that the application of these statutes to the Texas Electric Railway Company will destroy it and put it out of business, is a conclusion that we all wish might be erroneous, but even if it be true, the complaint must be leveled at the legislation and not at the failure of the courts to save. See State of California v. Murray H. Latimer et al., 59 S.Ct. 166, 83 L.Ed. ——, December 5, 1938. It is not within our power to save if it was within the power of Congress to destroy.

In addition to the evidence before the Interstate Commerce Commission, James P. Griffin, who is really the head of the road and has been so closely connected with it for twenty years, or more, that he is thoroughly familiar with all of its workings, receipts and expenditures, was permitted to testify over the objection of the respondents.

He testified that less than one-half of one percent of the freight handled by the road was interstate; that the wages would be raised one hundred percent if it were liable to the Act complained of, and that fifty-five to sixty men would be affected. He detailed a former trouble with employees.

He testified that they operated less street car lines now than in 1934, and that total passenger revenue in 1933 was $388,000, $239,000 of which was from the main lines, and $149,000 was from the city street lines. That the road has paid no bondholders since 1930, no interest and no dividends since the same time. That the passenger and baggage income for 1937 was $532,000, mail $25,000, and express $69,000. That the freight was carried in regular steam railway cars. That about two-thirds of the business originated on the line of the road. That in 1937 they interchanged with railways nine hundred thirty-one cars per month; six hundred thirty-eight of which was intrastate, and two hundred ninety-three of which were interstate. In 1936, of the one thousand twenty-four cars handled, three hundred seven were interstate.

There was also some additional documentary evidence offered, which included records of the Interstate Commerce Commission, showing the listing of the Texas Electric Railway Company, and also records of the United States Bureau of Census, as well as certain annual reports from 1921 to 1937. All of this additional testimony was objected to and we think the objection good.

We need say little about the attack upon the constitutionality of the Act. It

was for Congress to choose the means by which its objective of securing the uninterrupted service of the interstate railroads was to be secured, and its judgment, expressed in the Railway Labor Act and confirmed by the history of industrial disputes and of railroad labor relations, is not open to review here. The power of Congress over interstate commerce extends to such regulations of the relations of the rail carriers to their employees as are reasonably calculated to prevent the interruption of interstate commerce by strikes and their attendant disorders.

 The provisions of the Act prohibiting company unions and imposing on the railway the duty of "treating with" the authorized representative of its employees for the purpose of negotiating a labor dispute, do not infringe the rights of the carrier under the due process clause of the fifth amendment, Const. U.S.C.A. Virginian Railway v. System Federation, 300 ·U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789.

Given the fact of engaging in interstate commerce, such reasonable regulation of the activity as the Congress may conceive appropriate, may not be said to· be violative of any constitutional safeguard for citizen or property.

Each bill must be dismissed.