**PUBLIC SERVICE COMMISSION OF NEW YORK et al. v. UNITED STATES et al.**

District Court, S. D. New York.

July 17, 1944.

Judgment Affirmed Nov. 13, 1944.

See 65 S.Ct. 130.

352

Philip Hodes, of New York City (Philip Halpern, of Buffalo, N. Y., on the brief), for plaintiff Public Service Commission.

John J. Broderick, Corp. Counsel, of Yonkers, N. Y., for plaintiff City of Yonkers.

Horace M. Gray, of New York City, for plaintiff John W. Tooley, Jr.

Robert L. Pierce, Sp. Asst. to Atty. Gen., of Washington, D. C. (James B. M. McNally, U. S. Atty., and William L. Lynch, Asst. U. S. Atty., both of New York City, and Wendell Berge, Asst. Atty. Gen., on the brief), for defendant United States.

J. Stanley Payne, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D. C. (Daniel W. Knowlton, Chief Counsel, Interstate Commerce. Commission, of Washington, D. C., on the brief), for defendant Interstate Commerce Commission.

Harold H. McLean, of New York City (Thomas P. Healy, of New York City, on the brief), for defendant New York Central R. Co.

Before CLARK, Circuit Judge, and CAFFEY and RIFKIND, District Judges.

CLARK, Circuit Judge.

Plaintiffs, suing under 28 U.S.C.A. §§ 41(28), 43–48, seek to enjoin and set aside a certificate and order of the Interstate Commerce Commission authorizing defendant New York Central Railroad Company to abandon its so-called Yonkers branch line, which extends for a distance of 3.1 miles in Bronx and Westchester counties, New York, between Getty Square in the city of Yonkers and Van Cortlandt Park Junction in the city of New York. The Commission first authorized abandonment of this branch on March 20, 1943, and this court sustained the Commission's act a year ago in an action brought by the same plaintiffs. Public Service Commission of State of New York v. United States, D.C.S.D.N.Y., 50 F.Supp. 497. The Supreme Court, however, on appeal reversed this judgment, without consideration of the merits, because the Commission had failed to perform the requisite administrative function of making appropriate jurisdictional findings to support its order. The Interstate Commerce Act, as amended by the Transportation Act of 1920, gives the Commission authority to issue certificates of public convenience and necessity allowing any carrier subject to the Act to abandon "all or any portion" of its railroad line, 49 U.S.C.A. § 1(18-20); but it further provides that this authority shall not extend to the "abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation." Ibid. § 1(22). The Commission had not made express findings showing that the line was not within this exception; and in the absence of such "requisite jurisdictional findings," the Court held that the order should have been set aside. City of Yonkers v. United States, 320 U.S. 685, 692, 64 S.Ct. 327, 330. The Commission thereupon on its own motion reopened the proceedings, and, after the taking of additional evidence and the submission of briefs by all parties, issued the present order and report on February 25, 1944, the order to become effective on March 30, 1944. Thereafter the Commission denied petitions for reconsideration in a supplemental report and order dated March 24, 1944, and this action followed. Inasmuch as an interlocutory injunction was sought, the action now comes before a statutory district court of three judges. 28 U.S.C.A. § 47. At the hearing, however, all parties agreed that the action should be considered upon the merits and disposed of finally at this time.

The general facts are fully stated in the opinion of the Supreme Court, as well as in the previous opinion of this court, and need not be restated in detail here. The certificates of the Commission authorized a complete abandonment and dismantlement of the Yonkers branch; and in fact, service on the line ceased on June 30, 1943. Such cessation of service by the Central has been continuously lawful, for the Supreme Court on June 21, 1943, refused to grant a stay of this court's judgment sustaining the original abandonment order, 63 S.Ct. 1450, and subsequently stayed the effective date of its own mandate reversing our judgment until the Commission's new order became effective, 321 U.S. 745, 64 S.Ct. 517; 64 S.Ct. 633. The rails and other appurtenances of the line have,

nevertheless, been kept intact pending the outcome of this litigation.

 In the light of these previous proceedings, the crucial question before us is, of course, the jurisdiction of the Commission to enter the abandonment order. In its reports of February 25, 1944, and March 24, 1944, the Commission made painstaking subordinate findings as to the facts upon which exemption under § 1(22) of the Act had been asserted, and concluded that "the Yonkers branch is not a street, suburban or interurban electric railway within the contemplation of section 1(22), but is an electrically operated branch of a general steam railroad system, and that, even though there were doubt concerning its status as an electric railway, it would yet not be within the exemption of section 1(22), since it is operated as a part of applicant's general steam railroad system of transportation." Such findings, both subordinate and ultimate, surely meet the criticisms of the previous order by the Supreme Court; and, since they were the express objective of the Supreme Court's order of reversal, they must be entitled to at least prima facie weight in our considerations here.

Actually, the effect to be given by the courts to administrative findings of "jurisdictional facts" is not clear, as, indeed, the majority and minority opinions rendered by the Supreme Court in the present proceedings show. Thus, they pointed out, 320 U.S. at page 689, 64 S.Ct. at page 330, that the determination of what is included within the exemptions of § 1(22) has been held to involve a "mixed question of fact and law" upon which the final word is left with the courts,[1] citing United States v. Idaho, 298 U.S. 105, 109, 56 S.Ct. 690, 80 L.Ed. 1070, also that the aid of the Commission need not be sought, and the Commission need make no basic findings of jurisdic-

tional facts, before the jurisdiction of a court is invoked under § 1(20) to enjoin violations of the provisions of § 1(18–22), citing Texas & P. R. Co. v. Gulf, C. & S. F. R. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578; and cf. also Western Pacific California R. Co. v. Southern Pac. Co., 284 U.S. 47, 52 S.Ct. 56, 76 L.Ed. 160; Piedmont & N. R. Co. v. I. C. C., 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115. But, as the minority pointed out, 320 U.S. at page 695, 64 S.Ct. at page 333, "jurisdiction" competes with "right" "as one of the most deceptive of legal pitfalls." Where, as here, a court is asked to review an order of the Commission issued upon application for a certificate of public convenience and necessity under § 1(18), the initial validity of which is premised upon the existence of basic jurisdictional findings by the Commission, there must of necessity be some amelioration of the doctrine that the question of jurisdiction is for the independent judgment of the court. Otherwise it would hardly have been necessary to return the case for such findings. Indeed, in the light of at least some precedents, we were coming to think that review of "jurisdictional" and "constitutional" facts was more limited than had earlier been thought. Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 73, 56 S.Ct. 720, 80 L.Ed. 1033; Steamship Terminal Operating Co. v. Schwartz, 2 Cir., 140 F.2d 7; Brown, Fact and Law in Judicial Review, 56 Harv.L. Rev. 899, 925; Landis, The Administrative Process, 1938, 126-135; 41 Yale L.J. 1037; 46 Harv.L.Rev. 478; 80 U. of Pa.L.Rev. 1055; 22 Corn.L.Q. 515.

 But, so far as this court is concerned, we do not feel compelled to deter-

---

[1] The Railway Labor Act contains a substantially similar exemption of interurban electric railways, 45 U.S.C.A. § 151; but there the Interstate Commerce Commission determines only whether a line operated by electric power falls within the proviso upon request of the National Mediation Board or complaint of any party interested. The Act in general creates and defines the authority of the National Mediation Board and of the National Railroad Adjustment Board. It has been held that the power of the courts to review a determination of the Commission as to exemp- tion under § 151 is limited simply to whether the Commission has acted within its authority. Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 185, 59 S.Ct. 160, 83 L.Ed. 111, and cases cited therein; Texas Electric R. Co. v. Eastus, D.C.N.D.Tex., 25 F.Supp. 825, affirmed per curiam 308 U.S. 512, 60 S. Ct. 134, 84 L.Ed. 437; Sprague v. Woll, 7 Cir., 124 F.2d 767. Hence cases dealing with the power of the Commission under this statutory provision are not pertinent when the issue involves orders made by the Commission under its general powers.

mine just the exact weight to be accorded to the Commission's findings as to its jurisdiction. For we think that the subordinate facts found—which are, indeed, uncontested—amply support the jurisdiction of the Commission under any theory of the weight to be accorded its ultimate findings. Initially, there can be no doubt that the New York Central is a "general steam railroad system of transportation" within the meaning of the statute. Nor is there any merit to plaintiffs' assertion, made for the first time on petition for reconsideration of the present order, that the Yonkers line is a "spur * * * located wholly within one state" and thus exempt under § 1(22). As pointed out in the Commission report of March 24, 1944, there are four agency stations on the line, at which most of the thirty-four regular trains stopped daily except Sundays, and this would hardly bring the line within the scope of any generally accepted definition of the word "spur." See United States v. Idaho, supra; Detroit & M. R. Co. v. Boyne City, G. & A. R. Co., D.C.E.D. Mich., 286 F. 540, 547; Matter of Application of Atlanta & St. A. B. Ry. Co., 71 I.C.C. 784, 792; Acquisition of Line by Iberia & Vermilion R. R. Co., 111 I.C.C. 660, 663. Further, "the purpose of the statute to develop and maintain an adequate railway system for the people of the United States requires a broader and more liberal interpretation than that to be drawn from mere dictionary definitions of the words employed by Congress." Piedmont & N. R. Co. v. I. C. C., supra, 286 U.S. at page 311, 52 S.Ct. at page 545, 76 L.Ed. 1115; Texas & Pacific R. Co. v. Gulf, C. & S. F. R. Co., supra, 270 U.S. at pages 277, 278, 46 S.Ct. at page 266, 70 L.Ed. 578. In the latter case, a piece of track resembling the usual industrial track much more than the present line resembles a spur was held not to be an industrial track within the exemption of § 1(22).

■ It is not necessary to consider, as did the Commission, whether the Yonkers line is an "interurban electric railway,"[2] for even conceding such status, its operation as a part of the general New York Central steam railroad system seems to us quite clear. As this court pointed out in its previous opinion, the precedents show that the question is a practical one of operation of the railroad. Public Service Commission of State of New York v. United States, supra, 50 F.Supp. at page 498. And the facts here with respect to the operation of the railroad demonstrate that by reason of interconnection of physical facilities, intertwining of railroad operations, including personnel as well as equipment, together with unity of financial and fiscal functions, we have before us a single railroad system, from which this small branch cannot be lopped off for special treatment without illogical and unrealistic severing of practical railroad ties, with consequences prejudicial to the best operation of the system and the public interest as a whole.

Reference may first be made to the physical connections between this line and the general system. It is true that the Yonkers branch was originally constructed by an independent company in 1888, but it was leased and operated by the Central's predecessor as early as 1894, and became a complete part of the Central's Putnam Division on April 29, 1914. The Central has three divisions operating trains north from Manhattan and roughly parallel to each other: the Hudson, with trains operating on the east bank of the Hudson River, through Yonkers, being the main line which runs to Albany and thence westward to Chicago; the Putnam, next east of the Hudson, with tracks running beside the latter for about 2½ miles and with actual physical connection of the lines at two points, for trains from Sedgwick Avenue Station at Sedgwick Avenue and West 161st Street, New York City, to a connection with the Harlem Division at Putnam Junction near Brewster, New York; and still further east, the Harlem Division, extending from Mott Haven Junction to Chatham, New York, where it connects with the Central's main line from Boston to Albany. The Yonkers branch

---

[2] This is the problem with which the bulk of the cases dealing with this and similar exemption clauses have been concerned. Since the Yonkers line carried only passengers, it is perhaps a close question here, for the courts in the past have laid great stress upon the absence of freight traffic in determining that various lines are within the exemption. Piedmont & N. R. Co. v. I. C. C., supra; United States v. Chicago, N. S. & M. R. Co., 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583; Texas Electric R. Co. v. Eastus, supra note 1; Sprague v. Woll, supra note 1.

made use of the Putnam tracks from Sedgwick Avenue northerly to Van Cortlandt Park Junction, a distance of 4.7 miles, whence the line which is the subject of the order here ran between the Hudson and Putnam tracks to its terminus at Getty Square, where it was .3 of a mile from the Hudson tracks, and .7 of a mile from the Putnam tracks. Although the Putnam Division was steam operated, the Yonkers branch was equipped for electrical operation in 1926, both on its branch line proper and for the tracks it used in common with the Putnam trains. Train service consisted of seventeen electric trains each way, daily except Sunday, of two to four multiple-unit cars, operating on the eight-mile run from Getty Square to Sedgwick Avenue and stopping at the eight intermediate stations to receive and discharge passengers.

Thus it appears that the Yonkers branch was physically a part of the Putnam Division—almost concededly a part of the Central's general system—as it was so completely a part from the standpoint of railroad operation. Yonkers trains not only utilized the Putnam tracks from Van Cortlandt Park Junction to their terminus at Sedgwick Avenue, but also shared other facilities and personnel, such as trainmen, station agents, and maintenance men, with Putnam trains. Everyone at all connected with the Yonkers line was an employee of the Central, which published timetables and issued tickets for the branch. Further, the greatest number of passengers were through commuters to Grand Central, for whom transfer facilities to trains of the Hudson Division, which is conceded to be part of the general system, were arranged at High Bridge or University Heights. Passengers of this type could purchase through tickets for the whole trip, and the timetables showed the times of arrival of connecting trains of the Hudson Division. Five stations served both Yonkers branch and Putnam Division trains, and three of these also served Hudson Division trains. As to the two switching connections between the Putnam and Hudson tracks—one north of University Heights Station and the other near High Bridge Station—it is true that these were not adapted for ready interchange of southbound traffic; but the connection was used for handling a mail car north from Grand Central Station over the Putnam Division each day. And, as this court

pointed out before, 50 F.Supp. at page 499, it was necessary for the railroad at all times to reserve seats on Hudson trains for passengers transferring only at the joint stations shared with the Yonkers branch, even though these trains normally came down through Yonkers and these passengers could have made the whole run on them.

Financially, too, connection with the Central System is apparent. The Central has owned the Yonkers line outright for over thirty years, and took all its revenues, as well as absorbed its substantial net operating losses for the past several years. No separate accounts were ever kept, the Yonkers Station accounts being reported in the same manner as accounts from stations on other divisions; and the Central's annual reports have for long treated the Yonkers line part of the general system.

With such congeries of interrelationships, effective administration and operation of the interstate commerce laws demand that jurisdiction over a proceeding of this kind be vested in the Interstate Commerce Commission. Otherwise, state public service commissions may make limited orders operative only in the interstices of vast transportation systems which may effectively tie the hands of both the system and the Interstate Commerce Commission and operate to the detriment of transcontinental railroad lines which the interstate commerce laws are intended to protect and conserve. Piedmont & N. R. Co. v. I. C. C., supra. Consider, for example, the situation here if the state commission has the power, as it claims, to order the continuance of the Yonkers line. Unless there is to be a stalemate between the two authorities, that means that this commission can order effective train service into New York City, which means that it can order more train service on the through Hudson lines to Chicago. It is thus not only possible, but highly probable that a limited local service may be forced into priority over one of the most important through lines of the country. The fact that a branch runs wholly within one state and carries no interstate passengers cannot be controlling as to the application of the exemption if, as here, it constitutes an undue financial burden upon the interstate carrier system, State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878; cf. State of Texas v. Eastern Texas R. Co., 258 U.S. 204, 42 S.Ct. 281, 66 L.Ed.

566; for the essence of the power over interstate commerce which the several states have surrendered to Congress is the ability to protect it from undue burdens or discriminations. City of Yonkers v. United States, supra, 320 U.S. at page 690, 64 S.Ct. at page 330, and cases cited therein. Since by the Constitution this power is lodged in Congress, it should not be the purpose of the courts to delimit its utility and effectiveness with stultifying restrictions.

This view renders clearly inapposite some of the language in Piedmont & N. R. Co. v. I. C. C., supra, as well as United States v. Chicago, N. S. & M. R. Co., 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583, upon which plaintiffs especially rely; for both those cases involved simply the determination of whether electric lines of independent companies, not operating general systems, were "street, suburban, or interurban electric railways," and there were no claims, as, indeed, there could not be, that these lines were operated as part of a general steam railroad system. Nor can we agree with plaintiffs' interpretation of Texas Electric R. Co. v. Eastus, D.C.N.D.Tex., 25 F.Supp. 825, 830, 831, affirmed per curiam 308 U.S. 512, 60 S.Ct. 134, 84 L.Ed. 437, as outlawing, on the matter of connection with a general system, all evidence but that of physical connection. A more logical reading of that opinion is that while there must be some physical connections, evidence of financial or economic connections and of common ownership or management is also highly competent. This, too, is the approach which has been consistently followed by the Commission. Unified Operation of Railroad Facilities at Los Angeles Harbor, 150 I.C.C. 649, 661; Sacramento Northern Ry., 208 I.C.C. 203, 206, 210; Hudson & Manhattan R. Co., 216 I.C.C. 745, 752; Pittsburgh L. & W. R. Co. Practices, 227 I.C.C. 73, 101; Interurban Electric Ry. Co., 227 I.C.C. 589; New York, Westchester & Boston Ry. Co., 218 I.C.C. 253. But, as we have pointed out, even conceding plaintiffs' construction of the authorities, there is quite adequate evidence of purely physical connection here between the local and the through lines of the Central to uphold the jurisdiction of the Commission.

■ Since, therefore, jurisdiction exists for the Commission's order, we need say little more than was said before, 50 F. Supp. at page 499, on the merits. Here the usual administrative principle does govern to render the Commission's findings conclusive on us if supported by adequate evidence. United States v. Erie R. Co., 280 U.S. 98, 102, 50 S.Ct. 51, 74 L.Ed. 187; I. C. C. v. Union Pac. R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308. There is ample evidence to support the findings that business did not warrant continuance of the line, and that there were other means of transportation readily available to the public. Traffic had been steadily dropping off over the years on the Yonkers line, and the net operating loss is now found to be in excess of $60,000 a year, while two other rail lines and at least two busses ran from Yonkers into New York City. The Commission thus not only had jurisdiction to enter the abandonment order, but also acted within its lawful powers in so doing.

■ The suggestion of the Commuters Committee that the Commission was disqualified to act because of interest, since its members are appointed by the President, who has appealed for scrap for war purposes, seems sufficiently fantastic in its tenuity as not to require discussion.

Nowithstanding claims to the contrary made by appellants in the earlier proceeding, no separate findings of fact by us seem necessary or appropriate. But to avoid all doubt we state that we accept and adopt the Commission's findings and approve its conclusions of law. It follows that final judgment must go for the defendants. Accordingly the clerk is directed, immediately upon the filing of this opinion and on the same day, to enter final judgment dismissing the complaint on the merits.