CALIFORNIA *v.* TAYLOR ET AL.

No. 385.   Argued April 2, 1957.—Decided June 3, 1957.

*Herbert E. Wenig,* Assistant Attorney General of California, argued the cause for petitioner. With him on the brief were *Edmund G. Brown,* Attorney General, *Richard S. L. Roddis,* Deputy Attorney General, and *Edward M. White.*

*Burke Williamson* argued the cause for respondents. With him on a brief was *Jack A. Williamson* for Taylor et al., respondents.

*Philip C. Wilkins* filed a brief for the California State Employees' Association, as *amicus curiae,* in support of petitioner.

*Solicitor General Rankin, Assistant Attorney General Hansen* and *Charles H. Weston* filed a brief for the United States, as *amicus curiae,* urging affirmance.

MR. JUSTICE BURTON delivered the opinion of the Court.

The question presented here is whether the Railway Labor Act of May 20, 1926, 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.,* applies to the State Belt Railroad, a common carrier owned and operated by the State of California and engaged in interstate commerce. For the reasons hereafter stated, we hold that it does.

The operations of the State Belt Railroad have been described by this Court in *Sherman* v. *United States,* 282 U. S. 25; *United States* v. *California,* 297 U. S. 175; and *California* v. *Latimer,* 305 U. S. 255. It parallels the San Francisco waterfront, serves wharves and industrial plants, and connects with car ferries, steamship docks and three interstate railroads. It is a common carrier engaged in interstate commerce and files tariffs with the Interstate Commerce Commission.

For over 65 years, the Belt Railroad has been owned by the State of California. It is operated by the Board of State Harbor Commissioners for San Francisco Harbor, composed of three Commissioners appointed by the Gover-

nor. Its employees number from 125 to 255 and are appointed in accordance with the civil service laws of the State. These laws prescribe procedures for hirings, promotions, layoffs and dismissals, and authorize the State Personnel Board to fix rates of pay and overtime.[1]

On September 1, 1942, the Board of State Harbor Commissioners entered into a collective-bargaining agreement with the Brotherhood of Locomotive Firemen and Enginemen and the Brotherhood of Railroad Trainmen as the representatives of the Belt Railroad's operating employees. This agreement established procedures for promotions, layoffs and dismissals. It also fixed rates of pay and overtime. Those procedures and rates differed from their counterparts under the state civil service laws.

The collective-bargaining agreement conformed to the Railway Labor Act and was observed by the parties at least until January 1948. At that time, a successor Harbor Board instituted litigation in the state courts of California in which it contended that the Railway Labor Act had no application to the Belt Railroad, and that the wages and working conditions of the Railroad's employees were governed by the State's civil service laws rather than by the agreement. This contention was rejected by a local trial court and by the California District Court of Appeal. *State* v. *Brotherhood of Railroad Trainmen,* 222 P. 2d 27. It was, however, accepted by the Supreme Court of California, with one justice dissenting, 37 Cal. 2d 412, 422, 232 P. 2d 857, 864, certiorari denied, 342 U. S. 876.

Shortly thereafter, five employees of the Belt Railroad instituted the present action in the United States District Court for the Northern District of Illinois against

---

[1] See West's Cal. Ann. Codes, Constitution, Art. XXIV; West's Cal. Ann. Codes, Government, § 18000 *et seq.*

the ten members of the National Railroad Adjustment Board, First Division, and its executive secretary. The employees alleged that they had filed with the First Division, pursuant to § 3, First (i), of the Railway Labor Act, claims relating to their classifications, extra pay and seniority rights under the agreement. They charged that the five carrier members of the Division had refused to consider these claims on the ground that the Board was without jurisdiction, because, under the above decision of the Supreme Court of California, the Belt Railroad was not subject to the Railway Labor Act. The employees alleged that this refusal created an impasse in the ten-member Division and they sought a court order requiring action on their claims. The United States, answering on behalf of the First Division and its executive secretary, supported the complaint and prayer for relief. The carrier members, answering through their own attorneys, opposed the complaint, as did the present petitioner, the State of California, which intervened as a party defendant.

The District Court granted California's motion for summary judgment and dismissed the complaint. 132 F. Supp. 356. The Court of Appeals reversed. 233 F. 2d 251. It held that the Railway Labor Act applied to the Belt Railroad, and remanded the cause to the District Court with directions to enter a decree granting the relief sought. We granted certiorari to resolve the conflict between the United States Court of Appeals and the California Supreme Court as to the applicability of the Railway Labor Act to a railroad owned and operated by a State. 352 U. S. 940.[2] We invited the Solicitor

---

[2] Petitioner expressly excluded from the questions presented by its petition for certiorari the following issues involved in the decision of the Court of Appeals: whether the adjudication in the state courts was *res judicata* in the federal courts, whether the collective-bargaining agreement had been approved by the Department of

General to file a brief as *amicus curiae* and, in doing so, he urged that the Railway Labor Act was applicable to the State Belt Railroad.

The Railway Labor Act of 1926, 44 Stat. 577, evolved from legislative experimentation beginning in 1888.[3] The evolution of this railroad labor code was marked by a continuing attempt to bring about self-adjustment of disputes between rail carriers and their employees. To this end, specialized machinery of mediation and arbitration was established. The 1926 Act—unique in that it had been agreed upon by the majority of the railroads and

Finance of the State and, therefore, met the requirements of California law in that respect, and whether the California Personnel Board, rather than the National Railroad Adjustment Board, had jurisdiction over respondents' claims.

In its briefs before this Court, California suggests that the collective-bargaining agreement is invalid because the Board of State Harbor Commissioners lacked authority to negotiate the contract, some of the terms of which are in conflict with the state civil service laws. The Court of Appeals, however, held that this contention had been waived because it was not briefed there by the State and not mentioned in the State's oral argument. We, accordingly, do not recognize this contention here. The same argument was rejected by the California District Court of Appeal in the earlier state court litigation, *State* v. *Brotherhood of Railroad Trainmen*, 222 P. 2d 27, 31–33, and the Supreme Court of California apparently did not reject that position of the appellate court, 37 Cal. 2d 412, 421–422, 232 P. 2d 857, 863–864. Thus, even if the State's present suggestion were before us, we would feel constrained to accept the ruling of the District Court of Appeal.

[3] Act of 1888, 25 Stat. 501; Erdman Act of 1898, 30 Stat. 424; Newlands Act of 1913, 38 Stat. 103; Adamson Act of 1916, 39 Stat. 721, see *Wilson* v. *New*, 243 U. S. 332; General Order No. 8, February 21, 1918, signed by W. G. McAdoo, Director General of Railroads (formulating the Federal Government's labor policy after it took over the railroads in December 1917), Hines, War History of American Railroads (1928), 304–305, see also, p. 155 *et seq.;* Title III of the Transportation Act of 1920, 41 Stat. 469.

their employees [4]—incorporated practically every device previously used in settling disputes between carriers and their employees. These included (1) conferences between the parties; (2) appeal to a Board of Adjustment; (3) recourse to the permanent Board of Mediation; (4) submission of the controversy to a temporary Board of Arbitration; and (5) the establishment of an Emergency Board of Investigation appointed by the President.

Dissatisfaction with the operation of this legislation led to its 1934 amendments. 48 Stat. 1185.[5] One of the most significant changes was the creation of the National Railroad Adjustment Board composed of equal numbers of carrier representatives and representatives of unions national in scope. The Board was divided into four divisions, each with jurisdiction over particular crafts or classes and their disputes. § 3. This arrangement made available a National Board to settle disputes in case the carrier and its employees could not agree upon a system, group or regional board. The National Board was given jurisdiction over "minor disputes," meaning those involving the interpretation of collective-bargaining agreements in a particular set of facts. Either party to such a dispute could bring the other before the Board in what

---

[4] See S. Rep. No. 606, 69th Cong., 1st Sess. 2; 67 Cong. Rec. 463.

[5] The purposes of the Act were stated as follows:

"Sec. 2. . . . (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this Act; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 48 Stat. 1186–1187.

was, in fact, compulsory arbitration. *Brotherhood of Railroad Trainmen* v. *Chicago River & I. R. Co.,* 353 U. S. 30. Provisions were made for the enforcement of a Board order against a carrier in a United States District Court. § 3, First (p).

Section 2, Fourth, of the 1934 amendments insured to railroad employees the right to organize their own unions and the right of a majority of any craft or class of employees to select the representative of that craft or class. Section 2, Ninth, authorized the newly created National Mediation Board to hold representation elections and to certify the representative with which the carrier must deal. Section 2, Fourth, provided that the employees shall have the right to bargain collectively through representatives of their own choosing. On numerous occasions, this Court has recognized that the Railway Labor Act protects and promotes collective bargaining. *Virginian R. Co.* v. *System Federation No. 40,* 300 U. S. 515, 548–549, 553; *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297, 300, 302; *Order of Railroad Telegraphers* v. *Railway Express Agency, Inc.,* 321 U. S. 342, 346–347; *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 202; *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, 233, 235.[6]

If the Railway Labor Act applies to the Belt Railroad, then the carrier's employees can invoke its machinery established for adjustment of labor controversies, and the National Railway Adjustment Board has jurisdiction over respondents' claims. Moreover, the Act's policy of protecting collective bargaining comes into conflict with the rule of California law that state employees have no right to bargain collectively with the State concerning

---

[6] Another significant amendment to the Railway Labor Act came in 1951 when Congress authorized union-shop agreements, notwithstanding any state law. § 2, Eleventh, 64 Stat. 1238. See *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225.

terms and conditions of employment which are fixed by the State's civil service laws.[7] This state civil service relationship is the antithesis of that established by collectively bargained contracts throughout the railroad industry. "[E]ffective collective bargaining has been generally conceded to include the right of the representatives of the unit to be consulted and to bargain about the exceptional as well as the routine rates, rules, and working conditions." *Order of Railroad Telegraphers* v. *Railway Express Agency, Inc., supra,* at 347. If the Federal Act applies to the Belt Railroad, then the policy of the State must give way.[8]

> ". . . a State may not prohibit the exercise of rights which the federal Acts protect. Thus, in *Hill* v. *Florida,* 325 U. S. 538, the State enjoined a labor union from functioning until it had complied with certain statutory requirements. The injunction was invalidated on the ground that the Wagner Act included a 'federally established right to collective bargaining' with which the injunction conflicted." *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468, 474.

---

[7] *Nutter* v. *Santa Monica,* 74 Cal. App. 2d 292, 168 P. 2d 741; *Los Angeles* v. *Los Angeles Building Council,* 94 Cal. App. 2d 36, 210 P. 2d 305; *State* v. *Brotherhood of Railroad Trainmen,* 37 Cal. 2d 412, 417–418, 232 P. 2d 857, 861.

[8] For cases upholding the supremacy of federal statutes relating to railroads in interstate commerce, see *Napier* v. *Atlantic C. L. R. Co.,* 272 U. S. 605 (Boiler Inspection Act); *Southern R. Co.* v. *Railroad Commission of Indiana,* 236 U. S. 439 (Safety Appliance Act); *Erie R. Co.* v. *New York,* 233 U. S. 671 (Hours of Service Act); *Second Employers' Liability Cases,* 223 U. S. 1 (Employers' Liability Act). Cf. *Terminal Railroad Assn.* v. *Brotherhood of Railroad Trainmen,* 318 U. S. 1, to the effect that the Railway Labor Act did not preclude a State from establishing minimum health and safety regulations in the interests of railway employees. That case did not concern a conflict between federally protected collective bargaining and inconsistent state laws.

Under the Railway Labor Act, not only would the employees of the Belt Railroad have a federally protected right to bargain collectively with their employer, but the terms of the collective-bargaining agreement that they have negotiated with the Belt Railroad would take precedence over conflicting provisions of the state civil service laws.[9] In *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, 232, involving § 2, Eleventh, of the Railway Labor Act, which permits the negotiation of union-shop agreements notwithstanding any law of any State, we stated that "A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it and, by force of the Supremacy Clause of Article VI of the Constitution, could not be made illegal nor vitiated by any provision of the laws of a State."

We turn now to the applicability of the Railway Labor Act to the Belt Railroad. Section 1, First, of that Act defines generally the carriers to which it applies as *"any* carrier by railroad, subject to the Interstate Commerce Act . . . ." (Emphasis supplied.) The Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. § 1 (1), applies to all common carriers by railroad engaged in interstate transportation. The Belt Railroad concededly is a common carrier engaged in interstate transportation. It files its tariffs with the Interstate Commerce Commission, and the Commission has treated it and other state-owned interstate rail carriers as

---

[9] On October 30, 1944, the Attorney General of California rendered an opinion in which he concluded that the State Belt Railroad was subject to the Railway Labor Act, that the Board of Harbor Commissioners must bargain collectively with the Railroad's employees, and that the terms of the existing collective-bargaining agreement supersede conflicting provisions of the state civil service laws. 4 Op. Atty. Gen. Cal. (1944) 300–306; Rhyne, Labor Unions and Municipal Employe Law (1946), 247–251. See also, *Long Island R. Co.* v. *Department of Labor,* 256 N. Y. 498, 515–517, 177 N. E. 17, 23–24.

subject to its jurisdiction. See *California Canneries Co.* v. *Southern Pacific Co.,* 51 I. C. C. 500, 502–503; *United States* v. *Belt Line R. Co.,* 56 I. C. C. 121; *Texas State Railroad,* 34 I. C. C. Val. R. 276. Finally, this Court has recognized that practice. *United States* v. *California,* 297 U. S. 175, 186. See also, *New Orleans* v. *Texas & P. R. Co.,* 195 F. 2d 887, 889.

With the exception of the Supreme Court of California's holding in *State* v. *Brotherhood of Railroad Trainmen,* 37 Cal. 2d 412, 232 P. 2d 857, federal statutes regulating interstate railroads, or their employees, have consistently been held to apply to publicly owned or operated railroads. Yet none of these statutes referred specifically to public railroads as being within their coverage. In *United States* v. *California, supra,* the United States sought to recover a statutory penalty for the State's operation of this Belt Railroad in violation of the Safety Appliance Act, 27 Stat. 531–532, as amended, 45 U. S. C. §§ 2, 6. That Act applied to *"any* common carrier engaged in interstate commerce by railroad . . . ." (Emphasis supplied.) The State contended there, as it does here, that the Act was inapplicable to the Belt Railroad because a federal statute is presumed not to restrict a constituent sovereign State unless it expressly so provides. This Court said that this presumption "is an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated." 297 U. S., at 186. See also, *California* v. *United States,* 320 U. S. 577, 585–586; *Case* v. *Bowles,* 327 U. S. 92, 98–100. The Court then held unequivocally that the Safety Appliance Act was applicable to the Belt Railroad. "We can perceive no reason for extending it [the presumption] so as to exempt a business carried on by a state from the otherwise applicable provisions of an act of Congress, all-

embracing in scope and national in its purpose, which is as capable of being obstructed by state as by individual action." 297 U. S., at 186.

Likewise, three courts have ruled that the Federal Employers' Liability Act, 35 Stat. 65, as amended, 45 U. S. C. § 51, the coverage of which corresponded to that of the Safety Appliance Act, was applicable to public railroads. *Mathewes* v. *Port Utilities Commission,* 32 F. 2d 913 (D. C. E. D. S. C.); *Higginbotham* v. *Public Belt Railroad Commission,* 192 La. 525, 188 So. 395 (Sup. Ct. La.); *Maurice* v. *State,* 43 Cal. App. 2d 270, 110 P. 2d 706 (Cal. Dist. Ct. of App.) (involving the Belt Railroad now before us). Similarly, a Federal Court of Appeals has held that the Carriers Taxing Act of 1937, 50 Stat. 435, as amended, 45 U. S. C. (1946 ed.) § 261 (a companion measure of the Railroad Retirement Act of 1937, 50 Stat. 307, as amended, 45 U. S. C. § 228a), the coverage of which was identical with that of the Railway Labor Act, was applicable to this Belt Railroad. *California* v. *Anglim,* 129 F. 2d 455. At least two federal courts have taken the position that the Railway Labor Act is applicable to railroads owned or operated by the public. *National Council* v. *Sealy,* 56 F. Supp. 720, 722–723, aff'd, 152 F. 2d 500, 502; *New Orleans Public Belt R. Commission* v. *Ward,* 195 F. 2d 829; and see the opinion of the Attorney General of California, n. 9, *supra.*

Nothing in the legislative history of the Railway Labor Act indicates that it should be treated differently from the above-mentioned railway statutes, insofar as its applicability to a state-owned railroad is concerned. Congress apparently did not discuss the applicability of the Railway Labor Act to a state-owned railroad. This omission is readily explainable in view of the limited operations of publicly owned railroads. We are told by the parties that there are today 30 publicly owned railroads, all of which are switching or terminal roads, and

only 11 of which are operated directly by the public. The fact that Congress chose to phrase the coverage of the Act in all-embracing terms indicates that state railroads were included within it. In fact, the consistent congressional pattern in railway legislation which preceded the Railway Labor Act was to employ all-inclusive language of coverage with no suggestion that state-owned railroads were not included.[10]

The State contends that doubts are created about congressional intent to make the Railway Labor Act applicable to state-owned railroads by the fact that in certain other federal statutes governing employer-employee relationships, Congress has expressly exempted employees of the United States or of a State.[11] We believe, however, that this argument cuts the other way. When Congress wished to exclude state employees, it expressly so pro-

---

[10] Although the coverage of the Act of 1888, 25 Stat. 501, the Erdman Act of 1898, 30 Stat. 424, and the Newlands Act of 1913, 38 Stat. 103, was not related to the Interstate Commerce Act, those Acts by their terms applied to any carriers by railroad engaged in interstate transportation. The cross-reference to the Interstate Commerce Act, found in the Railway Labor Act, came with the Adamson Act of 1916, 39 Stat. 721, and was carried forward to Title III of the Transportation Act of 1920, 41 Stat. 469. A House Committee reporting on the bill which was to become Title III of the Transportation Act stated that "Section 300 defines the term 'carrier' so that disputes of the railroads and express and sleeping-car companies, *engaged in interstate commerce,* are subject to the provisions of the title." (Emphasis supplied.) H. R. Rep. No. 456, 66th Cong., 1st Sess. 24.

[11] The statutes cited are the National Labor Relations Act of 1935, 49 Stat. 449, as amended by the Labor Management Relations Act of 1947, 61 Stat. 137, 29 U. S. C. § 152 (2); the War Labor Disputes Act of 1943, 57 Stat. 164, 50 U. S. C. App. (1946 ed.) § 1502 (d); the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U. S. C. § 203 (d), and the re-employment provisions of the Universal Military Training and Service Act, 62 Stat. 614–615, 50 U. S. C. App. § 459 (b).

vided. Its failure to do likewise in the Railway Labor Act indicates a purpose not to exclude state employees.[12]

The Railway Labor Act is essentially an instrument of industry-wide government. See *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 749, 751 (dissenting opinion). The railroad world for which the Act was designed has been described as "a state within a state. Its population of some three million, if we include the families of workers, has its own customs and its own vocabulary, and lives according to rules of its own making. . . . This

---

[12] When Congress desired to make exceptions to the broad coverage of the Railway Labor Act, it expressly stated that intent in a proviso to the Act's definition of the term "carrier":

"Section 1. . . .

"First. . . . *Provided, however,* That the term 'carrier' shall not include any street, interurban, or suburban electric railway, unless such railway is operating as a part of a general steam-railroad system of transportation, but shall not exclude any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power. The Interstate Commerce Commission is hereby authorized and directed upon request of the Mediation Board or upon complaint of any party interested to determine after hearing whether any line operated by electric power falls within the terms of this proviso. The term 'carrier' shall not include any company by reason of its being engaged in the mining of coal, the supplying of coal to a carrier where delivery is not beyond the mine tipple, and the operation of equipment or facilities therefor, or in any of such activities." 48 Stat. 1185–1186, 54 Stat. 785–786, 45 U. S. C. § 151, First.

In *United States* v. *United Mine Workers,* 330 U. S. 258, this Court ruled that the general term "employer," as used in the restrictive provisions of the Norris-LaGuardia Act, 47 Stat. 70, and § 20 of the Clayton Act, 38 Stat. 738, did not include the Federal Government, and that an injunction could issue in a federal court to prevent a union and its officers from precipitating a strike in the bituminous coal mines which, at the time, were being operated by the Government. That case is not a guide here since the statutes there involved differ widely in history and purpose from the Railway Labor Act. See *Brotherhood of Railroad Trainmen* v. *Chicago River & I. R. Co.,* 353 U. S. 30, 39–42.

state within a state has enjoyed a high degree of internal peace for two generations; despite the divergent interests of its component parts, the reign of law has been firmly established." Garrison, The National Railroad Adjustment Board; A Unique Administrative Agency, 46 Yale L. J. 567, 568–569 (1937). Congress has not only carved this singular industry out of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U. S. C. § 182, but it has provided, by the Railway Labor Act, techniques peculiar to that industry. An extended period of congressional experimentation in the field of railway labor legislation resulted in the Railway Labor Act and produced its machinery for conciliation, mediation, arbitration and adjustments of disputes. A primary purpose of this machinery of railway government is "To avoid any interruption to commerce or to the operation of any carrier engaged therein . . . ." 48 Stat. 1186 (§ 2), 45 U. S. C. § 151a. See *Slocum* v. *Delaware, L. & W. R. Co.,* 339 U. S. 239, 242. Like the Safety Appliance Act, the Railway Labor Act is "all-embracing in scope and national in its purpose, which is as capable of being obstructed by state as by individual action." *United States* v. *California,* 297 U. S. 175, 186. The fact that, under state law, the employees of the Belt Railroad may have no legal right to strike [13] reduces, but does not eliminate, the possibility of a work stoppage. It was to meet such a possibility that the Act's "reign of law" was established. A terminal railroad facility like the Belt Railroad is a vital link in the national transportation system. Its continuous operation is important to the national flow of commerce.

The fact that the Act's application will supersede state civil service laws which conflict with its policy of promoting collective bargaining does not detract from the conclu-

---

[13] See the *Los Angeles Building Council* case, n. 7, *supra.*

sion that Congress intended it to apply to any common carrier by railroad engaged in interstate transportation, whether or not owned or operated by a State. The principal unions in the railroad industry are national in scope, and their officials are intimately acquainted with the problems, traditions and conditions of the railroad industry. Bargaining collectively with these officials has often taken on a national flavor,[14] and agreements are uniformly negotiated for an entire railroad system. "[B]reakdowns in collective bargaining will typically affect a region or the entire nation." Lecht, Experience under Railway Labor Legislation (1955), 4. It is by no means unreasonable to assume that Congress, aware of these characteristics of labor relations in the interconnected system which comprises our national railroad industry, intended that collective bargaining, as fostered and protected by the Railway Labor Act, should apply to all railroads. Congress no doubt concluded that a uniform method of dealing with the labor problems of the railroad industry would tend to eliminate inequities, and would promote a desirable mobility within the railroad labor force.[15]

---

[14] Lecht, Experience under Railway Labor Legislation (1955), 4, 70–71, 158, 161, 167–168, 177, 192, 209, 225, 233.

[15] Congress clearly had considerations such as these in mind in 1951 when it authorized union-shop agreements, notwithstanding any state law. See n. 6, *supra*. The House Committee on Interstate and Foreign Commerce stated that—

"It will be noted that the proposed paragraph eleventh would authorize agreements notwithstanding the laws of any State. For the following reasons, among others, it is the view of the committee that if, as a matter of national policy, such agreements are to be permitted in the railroad and airline industries it would be wholly impracticable and unworkable for the various States to regulate such agreements. Railroads and airlines are direct instrumentalities of interstate commerce; the Railway Labor Act requires collective bargaining on a system-wide basis; agreements are uniformly negotiated for an entire railroad system and regulate the rates of pay,

Finally, the State suggests that Congress has no constitutional power to interfere with the "sovereign right" of a State to control its employment relationships on a state-owned railroad engaged in interstate commerce. In *United States* v. *California, supra,* this Court said that the State, although acting in its sovereign capacity in operating this Belt Railroad, necessarily so acted "in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government." 297 U. S., at 184. "California, by engaging in interstate commerce by rail, has subjected itself to the commerce power, and is liable for a violation of the Safety Appliance Act, as are other carriers . . . ." *Id.,* at 185. That principle is no less applicable here. If California, by engaging in interstate commerce by rail, subjects itself to the commerce power so that Congress can make it conform to federal safety requirements, it also has subjected itself to that power so that Congress can regulate its employment relationships. See also, *California* v. *United States,* 320 U. S. 577, 586; cf. *Railway Employees' Dept.* v. *Hanson,* 351 U. S. 225, 233–238.[16]

The judgment of the Court of Appeals accordingly is

*Affirmed.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

---

rules of working conditions of employees in many States; the duties of many employees require the constant crossing of State lines; many seniority districts under labor agreements, extend across State lines, and in the exercise of their seniority rights employees are frequently required to move from one State to another." H. R. Rep. No. 2811, 81st Cong., 2d Sess. 5.

[16] The contention of the State that the Eleventh Amendment to the Constitution of the United States would bar an employee of the Belt Railroad from enforcing an award by the National Railroad Adjustment Board in a suit against the State in a United States District Court under § 3, First (p), of the Act is not before us under the facts of this case.