718 F.2d 533
 114 L.R.R.M. (BNA) 3007, 98 Lab.Cas. P 10,470
 STATEN ISLAND RAPID TRANSIT OPERATING AUTHORITY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
SYSTEM FEDERATION NO. 1, RAILWAY EMPLOYEES DEPARTMENT,
AFL-CIO, etc., Intervenors and Plaintiffs-Appellees,
v.
John G. DEROOS, etc., et al., Defendants-Appellants.
BROTHERHOOD OF LOCOMOTIVE ENGINEERS, et al., Plaintiffs-Appellees,
v.
STATEN ISLAND RAPID TRANSIT OPERATING AUTHORITY, et al.,
Defendants-Appellants.
 Nos. 1091, 1427, Dockets 80-4010, 82-7925.
 United States Court of Appeals,
Second Circuit.
 Argued May 9, 1983.
Decided Sept. 21, 1983.
 
 Martin B. Schnabel, Brooklyn, N.Y. (Richard K. Bernard, Gen. Counsel, Brooklyn, N.Y.), for petitioner and defendants-appellants.
 Louis Mackall, Attorney, I.C.C., Washington, D.C. (John Broadley, General Counsel, Henri F. Rush, Associate Gen. Counsel; William F. Baxter, Asst. Atty. Gen., John J. Powers, III and Frederic Freilicher, Attorneys, Dept. of Justice, Washington, D.C., of counsel), for respondents.
 
 
 1
 Michael S. Wolly, Washington, D.C. (Edward J. Hickey, Jr., Mulholland & Hickey, Washington, D.C., of counsel; Paul G. Reilly, Jr., Reilly, Fleming & Reilly, New York City, of counsel), for intervenor and plaintiff-appellee System Federation No. 1.
 
 
 2
 Harold A. Ross, Cleveland Ohio (Ross & Kraushaar, Cleveland, Ohio), for intervenors and plaintiffs-appellees Broth. of Locomotive Engineers and Broth. of Railroad Signalmen.
 
 
 3
 James L. Highsaw, John J. Sullivan, Washington, D.C. (Highsaw & Mahoney, Washington, D.C.), for intervenors and plaintiffs-appellees Broth. of Railway, Airline and Steamship Clerks and Intern. Ass'n of Machinists and Aerospace Workers.
 
 
 4
 Edward D. Friedman, Washington, D.C. (Friedman & Wirtz, Washington, D.C.), for intervenor and plaintiff-appellee United Transp. Union.
 
 
 5
 Sidney Fox, New York City (Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City), for intervenors and plaintiffs-appellees Broth. of Locomotive Engineers, Broth. of Railroad Signalmen, Intern. Ass'n of Machinists and Aerospace Workers, Brotherhood of Railway, Airline and Steamship Clerks, and United Transp. Union.
 
 
 6
 Before OAKES, CARDAMONE and PIERCE, Circuit Judges.
 
 PIERCE, Circuit Judge:
 
 7
 This case requires us to determine whether the Staten Island Rapid Transit Operating Authority (SIRTOA), which operates on a strip of railroad located on Staten Island, New York, is a "carrier" within the meaning of the Railway Labor Act, 45 U.S.C. Sec. 151 First (1976), thus exempting its employees from the anti-strike provisions of the New York Civil Service Law Secs. 210-211 (McKinney 1983) (Taylor Law). The district court, having adopted the determination by the Interstate Commerce Commission that SIRTOA falls within the Railway Labor Act, ruled that the Taylor Law cannot be invoked to enjoin or punish strikes by SIRTOA's employees. For the reasons set forth below, we affirm the ruling of the Interstate Commerce Commission and the decisions of the district judge.
 
 I. BACKGROUND
 
 8
 The Staten Island Rapid Transit Operating Authority (SIRTOA), a public benefit corporation and a subsidiary of the Metropolitan Transportation Authority (MTA), was organized in 1970 for the purpose of taking over passenger operations on a 14.5 mile strip of electric railroad line that runs between St. George and Tottenville on Staten Island, New York. The line predominantly serves some 21,500 persons per weekday by providing intrastate passenger service.
 
 
 9
 The predecessor of SIRTOA, the Staten Island Rapid Transit Railway Company (SIRT), is a subsidiary of the Baltimore and Ohio Railroad Company (B & O), which for some 90 years operated rail service on Staten Island as part of its nationwide railroad system. SIRT continues to effect rail service on the line, in the interstate transportation of freight, with connections with the B & O and Consolidated Rail Corporation. Its current freight operation consists of one five-car train daily, five days a week, serving the Nassau Smelting Company. SIRT employees are covered by the terms of the Railway Labor Act, 45 U.S.C. Secs. 151-162 (1976 & Supp. V 1981) (RLA).
 
 
 10
 On May 29, 1970, the City of New York and SIRT entered into a purchase and sale Agreement whereby the City was to purchase the St. George/Tottenville line from SIRT. The Agreement provided, inter alia, that the City, or any contractor or successor, would take over and offer to electing SIRT employees 213 employment positions, "pursuant to the provisions of the Railway Labor Act ... the Railroad Retirement Act ... the Railroad Unemployment Insurance Act ... and the Carriers Taxing Act."[1] (Agreement Sec. 6(d)). In a separate Freight Tracking Agreement (incorporated into the purchase and sale Agreement), SIRT reserved the right to operate freight service over the St. George/Tottenville line. Pursuant to that Freight Trackage Agreement, the City was to maintain, repair, and renew the trackage line at its own expense and to maintain it in reasonably good condition for SIRT's freight operations. Shortly after the May 29 Agreement was executed, the MTA established SIRTOA for the purpose of operating the line.
 
 
 11
 The proposed Agreement was submitted to the Interstate Commerce Commission (ICC) for approval, as required by former section 1(18) of the Interstate Commerce Act (ICA), 49 U.S.C. Sec. 1(18) (1976) (recodified at 49 U.S.C. Secs. 10901-10902 (Supp. V 1981)). On April 21, 1971, the ICC authorized the City's purchase of the line from SIRT, as well as the Freight Trackage Agreement (Finance Docket Nos. 26343, 26342, respectively).[2] In its Certificate and Order (Finance Docket No. 25717), the Commission ordered that the authority granted was conditioned on the consummation of the acquisition and trackage rights transactions approved therein, and was "subject to the conditions for the protection of affected employees as submitted in the agreements of record." Besides the May 29, 1970 Agreement, "agreements of record" included those dated February 5, 1971, wherein the City, "pursuant to the provisions of the Railway Labor Act, the Railroad Retirement Act, and the Railroad Unemployment Act," undertook to employ certain SIRT employees and assumed the collective bargaining contracts of SIRT. The ICC's approval of the reservation of trackage rights to SIRT was based on a specific finding that the transaction approved therein came within the scope of former section 5(2) of the ICA, (recodified at 49 U.S.C. Secs. 11343-11345 (Supp. V 1981)). SIRTOA assumed operation of the line for St. George/Tottenville passenger service on July 1, 1971.
 
 II. PROCEDURAL HISTORY
 
 12
 In July 1974, the unions comprising System Federation No. 1, pursuant to the RLA, 45 U.S.C. Sec. 156, notified SIRTOA of their intention to negotiate a change in their agreements covering "pay, rules, or working conditions." Having exhausted the various statutory negotiation and mediation stages mandated by the RLA, the parties were unable to reach accord. On January 17, 1977, the union members picketed at various points on the railroad. The strikers returned to work, however, after being served that same day with a temporary restraining order issued by the New York State Supreme Court, Kings County. The restraining order was subsequently vacated, and SIRTOA's motion for a preliminary injunction was denied. While appeal was pending in the Appellate Division, Second Department, the matter was removed to the United States District Court for the Eastern District of New York. On SIRTOA's motion, the case was remanded to state court by Judge Weinstein, who concluded that the federal court should abstain from deciding matters involving "complex administrative operations of the City and State."
 
 
 13
 After a full trial in state court, SIRTOA obtained a permanent injunction "enjoining the defendants, their members, officers, representatives, and all other persons acting on their behalf or in concert with them, from engaging in causing, instigating, encouraging or lending support or assistance to any strike, work stoppage, or slowdown in the operating of the Staten Island Rapid Transit Operating Authority railroad." Staten Island Rapid Transit Operating Authority v. International Brotherhood of Electrical Workers, No. 878-77 (S.Ct., Kings County, February 28, 1977). The Appellate Division affirmed, stating:
 
 
 14
 [It is] undeniable that SIRTOA is essentially an intrastate passenger or commuter operation, fully akin to the city's rapid transit system.... The connection between SIRTOA and interstate commerce is extremely tenuous .... It is not a vital link in the national transportation system, the continued operation of which is important to the national flow of commerce; and the instant labor dispute does not present problems of national or even regional magnitude, which problems would require uniform treatment on a national scale.... [B]alancing SIRTOA's minimal and tenuous connection to interstate commerce, exemplified by one freight run per day for the convenience of one customer, against the State's direct and compelling interest in preventing strikes by public employees and ensuring the continuation of commuter rail service for thousands of Staten Island residents, it is clear that these public employees may properly be enjoined under the Taylor Law, from striking against SIRTOA as a means of "self help" in their continuing dispute.
 
 
 15
 Staten Island Rapid Transit Operating Authority v. International Brotherhood of Electrical Workers, 57 A.D.2d 614, 615-16, 393 N.Y.S.2d 773, 775-76 (2d Dep't 1977). Leave to appeal was denied by the New York State Court of Appeals, 42 N.Y.2d 804, 397 N.Y.S.2d 1028, 366 N.E.2d 1364 (1977), and the United States Supreme Court denied certiorari, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977).
 
 
 16
 On April 3, 1978, certain SIRTOA employees, members of unions comprising System Federation No. 1, instituted a strike against the railroad company. The strike ended on April 14. As a result of the strike, the President and Vice President of the International Brotherhood of Electrical Workers were held in criminal contempt of the state court injunction. In addition, SIRTOA, acting pursuant to the Taylor Law, N.Y.Civ.Serv. Law Sec. 210, placed striking workers on probation, id. Sec. 210(2)(f) (now repealed), deducted from each striking employee's compensation "an amount equal to twice his daily rate of pay for each day or part thereof that it [is] determined that he [engaged in an unlawful strike]," id. Sec. 210(2)(g), and imposed other sanctions on the union, id. Sec. 210(3).
 
 
 17
 In 1978, the union commenced two actions in the United States District Court for the Eastern District of New York,[3] which were assigned to then Chief Judge Mishler. In both actions, the relief sought was (1) a declaratory judgment that the relationship between SIRTOA and the unions falls within the province of the Railway Labor Act and that, therefore, the New York Taylor Law could not be applied to their striking members; and (2) an injunction requiring nullification of the disciplinary action imposed as a consequence of the April 1978 strike. The parties cross-moved for summary judgment. By order dated February 9, 1979, the district judge dismissed the complaints without prejudice. The court ruled that if SIRTOA employees were covered by the RLA, then federal preemption would operate to preclude application of the New York Taylor Law. The court abstained from exercising its jurisdiction in the matter, however, in order to allow the ICC to rule on whether SIRTOA is a "carrier" within the RLA, or whether it is exempted by the proviso to 45 U.S.C. Sec. 151 First, excepting from the Act's coverage any "street, interurban, or suburban electric railway." Thereafter, by ruling dated November 8, 1979, the ICC determined that SIRTOA is a carrier subject to the ICA and also as defined in section 151 First of the RLA, and that the St. George/Tottenville line is not exempted from such coverage under the terms of the electric railway proviso. Brotherhood of Locomotive Engineers v. Staten Island Rapid Transit Operating Authority, 360 I.C.C. 464 (1979).
 
 
 18
 In December, 1979, the plaintiff unions returned to the district court and moved for reconsideration of the court's February 9, 1979 decision dismissing their motion for summary judgment, Fed.R.Civ.P. 60(b). After reargument, but before the district judge rendered his decision, further contract negotiations between the parties failed, and in February 1981, SIRTOA employees, members of the United Transportation Union conducted a three-hour strike. SIRTOA, again acting pursuant to the Taylor Law, assessed payroll deductions against the striking employees. The plaintiffs amended their pleadings still pending in the district court to seek relief as to the 1981 strike sanctions.
 
 
 19
 In a decision dated October 19, 1982, the district court, adopting the ICC ruling, held that "so long as SIRTOA's labor relations are governed by the RLA, the Taylor Law cannot be invoked to enjoin or punish strikes by SIRTOA employees." The district judge vacated his February 9, 1979 order dismissing the complaints, and granted plaintiffs' motions for summary judgment. In so ruling, the judge rejected defendants' arguments that collateral estoppel precluded relitigation of the issues decided by the Appellate Division and that federal preemption did not apply.
 
 
 20
 In these consolidated appeals, appellant SIRTOA seeks review of the November 9, 1979 ICC order holding it to be a "carrier" as defined in the RLA; co-appellants SIRTOA, John G. DeRoos (former Senior Executive Officer of SIRTOA), and George Governale (Director of Administration of SIRTOA) appeal from the February 9, 1979 and November 10, 1982 judgments of the United States District Court for the Eastern District of New York, holding that the RLA preempts the anti-strike provisions of the Taylor Law, adopting the ICC decision, and declining to apply collateral estoppel to the state court judgment.
 
 III. DISCUSSION
 
 21
 A. The ICC Determination: Is SIRTOA a "Carrier"?
 
 
 22
 The principal issue herein is whether SIRTOA is a "carrier" within the Railway Labor Act, defined, in pertinent part, as follows:
 
 
 23
 First. The term "carrier" includes any express company, sleeping-car company, carrier by railroad, subject to the Interstate Commerce Act, and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service ... in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad, and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the business of any such "carrier": Provided, however, That the term "carrier" shall not include any street, interurban, or suburban electric railway, unless such railway is operating as a part of a general steam-railroad system of transportation, but shall not exclude any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power. The Interstate Commerce Commission is authorized and directed upon request of the Mediation Board or upon complaint of any party interested to determine after hearing whether any line operated by electric power falls within the terms of this proviso.
 
 
 24
 45 U.S.C. Sec. 151 First (emphasis added). Appellants challenge the ICC's determination that SIRTOA is (1) subject to the Interstate Commerce Act; (2) comes within the second criterion of the "common control" provision of the RLA, 45 U.S.C. Sec. 151 First (a company "which operates any equipment or facilities or performs any service ... in connection with ..."); and (3) is not excluded from coverage pursuant to the "electric railway" proviso. Because we conclude that the Commission's rulings were not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. Sec. 706(2)(A) (1976), we do not disturb those determinations. See also United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946) (function of reviewing court "limited to ascertaining whether there is warrant in the law and the facts" for Commission's action); Rochester Telephone Corp. v. United States, 307 U.S. 125, 139-40, 59 S.Ct. 754, 761-62, 83 L.Ed. 1147 (1939) (judicial review of ICC orders is limited); Long Island Railroad Co. v. United States, 568 F.2d 254, 257 (2d Cir.1977) (function of reviewing court with respect to ICC order "is extremely limited").
 
 1. SIRTOA is a "Carrier" under the ICA
 
 25
 While it is true that SIRTOA's primary function with respect to the St. George/Tottenville line is to operate local passenger service, which is exempt from the ICA,[4] we do not find improper the Commission's determination that SIRTOA's concurrent responsibilities for maintenance of the line for interstate freight service brings it within the ICA. Indeed, as the Commission found, SIRTOA not only has the express obligation to maintain the line for this purpose, but it also has a latent duty under the current certificate of public convenience and necessity to furnish that freight service which is provided by SIRT under the Trackage Rights Agreement. See ICA, 49 U.S.C. Sec. 1(4) (recodified at 49 U.S.C. Sec. 11101 (Supp. V 1981)).[5] Moreover, that SIRTOA is nevertheless obligated to maintain the line in accordance with the higher standard required for passenger service, does not dictate a different result. Under ICA, 49 U.S.C. Sec. 1(3)(a) (recodified at 49 U.S.C. Sec. 10102(24) (Supp. V 1981)), SIRTOA comes within the ICA because it is engaged in transportation by railroad. Such "transportation" includes "all services in connection with" transportation of property. Id. It is a sufficient basis for bringing SIRTOA within the ICA that SIRTOA is required to maintain the line (at whatever level), and that its dispatchers control the flow of the interstate traffic on the line. Cf. United States v. Baltimore & Ohio Railroad Co., 333 U.S. 169, 68 S.Ct. 494, 92 L.Ed. 61 (1948) (spur track owned by non-carrier subject to ICA because used by interstate rail carrier under trackage rights agreement). On the facts presented herein, we see no ground for overturning the Commission's determination that SIRTOA falls within the Interstate Commerce Act.
 
 
 26
 2. SIRTOA is within the Common Control Provision of RLA, 45 U.S.C. Sec. 151 First
 
 
 27
 The Commission determined that because SIRTOA operates and physically maintains the line over which SIRT conducts its interstate freight service, it is "a company ... which operates any equipment or facilities or performs any service ... in connection with the transportation, receipt, delivery ... and handling of property transported by railroad."[6] We do not disturb this determination. Contrary to appellants' assertions, SIRTOA indeed does appear to have contractual and legal responsibility for maintenance of the line. As a condition for authorizing the City's acquisition of the line, the Commission imposed on the City an obligation to maintain the track, per the Trackage Rights Agreement which was incorporated into the May 29 purchase and sale contract.[7] In our view, the Commission's conclusion that this obligation is sufficient to bring SIRTOA within the definition of "carrier" is not unfounded in law or fact and does not call for reversal.
 
 
 28
 3. The Electric Railway Proviso: SIRTOA not Exempted
 
 
 29
 Having concluded that SIRTOA falls within the ICA and RLA, we now address whether it is excluded by the electric railway proviso of 45 U.S.C. Sec. 151 First. The proviso exempts "any street, interurban, or suburban electric railway" that is not "operating as a part of a general steam-railroad system of transportation, but shall not exclude any part of the general steam-railroad system of transportation." In addressing the question of whether SIRTOA falls within the proviso, the Commission, as a threshold matter, stated:
 
 
 30
 We construe the proviso as applying to exempt application of the RLA to a carrier operating such an electrified line, if the line so operated by it is not otherwise used directly or indirectly in the movement of freight and passengers associated with a general system of transportation; that is, such transportation as is otherwise subject to the Interstate Commerce Act and subject to Commission certification. Where that line connects with a general system and is used to effect service over that system, then the proviso would not apply.
 
 
 31
 360 I.C.C. at 475 (citations omitted) (emphasis added). Applying this construction to SIRTOA, the Commission pointed out:
 
 
 32
 [N]ot only does SIRTOA's line connect with the system of the B & O, but also it is now actively used by SIRT, an affiliate of the B & O, in connection with operation on that system, to effect freight service on the line as authorized by this Commission.... Furthermore SIRTOA is now actively discharging the right of way and track maintenance functions on the line, incumbent of a common carrier and wholly consistent with the implicit duties created by virtue of the certificate issued in Finance Docket No. 26343 [purchase of the line by the City].
 
 
 33
 360 I.C.C. at 475-76. For these reasons, the ICC found that the proviso inapplicable to SIRTOA.
 
 
 34
 Appellants argue that the Commission's construction of the proviso is flawed, principally in that the proviso conditions exemption not on whether the line operates as part of the general system of transportation, but, rather, on whether the railway itself so operates. Appellants further contend that SIRTOA functions exclusively as a passenger railway and derives an insubstantial amount of revenue from the freight service, and that therefore it falls squarely within the proviso, see Piedmont & Northern Railway Co. v. Interstate Commerce Commission, 286 U.S. 299, 307, 52 S.Ct. 541, 543, 76 L.Ed. 1115 (1932) ("These [electric railways] are essentially local, are fundamentally passenger carriers, are to an inconsiderable extent engaged in interstate carriage, and transact freight business only incidentally and in small volume.").
 
 
 35
 We are not convinced that the Commission misconstrued the proviso. The RLA, as remedial legislation, should be interpreted liberally, and exemptions from it narrowly. See id. at 311, 52 S.Ct. at 545; see generally 3 C. Sands, Sutherland's Statutes and Statutory Construction Secs. 60.01-60.05 (4th ed. 1973). Given the general purposes of the RLA, as expressed therein, 45 U.S.C. Sec. 151a ("To avoid any interruption to commerce or to the operation of any carrier engaged therein," inter alia ), the Commission's application of the proviso to the physical line itself is not unreasonable. There is authority which tends to support such a view. In Sprague v. Woll, 124 F.2d 767, 769-70 (7th Cir.1941), for example, the court noted:
 
 
 36
 It is not necessary, of course, that there be financial connection between the electric and the steam railroads to bring a railroad company within the statute. It is the actual physical connection which is of persuasive weight. If there were no physical connections, there could be no uninterrupted interstate carriage. Where two carriers are physically joined continuous movement of freight follows. Such freight business has no connection with passenger business, is independent thereof and arises from a separate and distinct line of carrier endeavor.
 
 
 37
 Thus, the Sprague court held that it is the physical connection which is the persuasive factor in determining whether a company is part of the general steam-railroad system of transportation. Similarly, in Texas Electric Railway Co. v. Eastus, 25 F.Supp. 825 (N.D.Tex.1938), aff'd, 308 U.S. 512, 60 S.Ct. 134, 84 L.Ed. 437 (1939), the district court, interpreting the electric railway proviso, also stressed the notion of physical connection as the determining factor. The court stated:
 
 
 38
 Physical connection allows movement of freight by one system--the system which joins the two carriers physically. Thus, an interurban, even though its equipment may be lighter, which, in its ordinary course of business, is so connected by a rail plan as to permit cars of freight in large quantities and not in sporadic instances, to pass from steam transportation systems, to and upon its own rails, for carriage and transportation, must be considered to be outside the proviso.
 
 
 39
 25 F.Supp. at 831.
 
 
 40
 In the instant case, the appellant's proffered distinction between "line" and "railway" may indeed be more theoretical than real, since, as a practical matter, the line and railway are integrally related. Nor are we persuaded that Northern Coast Transportation Co., 286 I.C.C. 691 (1952), or Philadelphia & Western Railway Co., 255 I.C.C. 521 (1943), relied upon by appellants, required the Commission to find SIRTOA to be within the proviso. While these cases are factually similar to the instant case to the extent that they involved entities that had minimal connection with interstate commerce, the Commission could reasonably have concluded that SIRTOA is distinguishable. Unlike these other cases, for example, where the interstate use of the lines in question was sporadic at best, the line herein is used regularly (once daily, five days per week) for purposes of interstate commerce. We therefore do not find that the ICC's determination as to SIRTOA is unwarranted under existing law.
 
 
 41
 In any event, it appears evident that SIRT and the City did not contemplate a "line"/"railway" distinction when the May 29, 1970 purchase and sale Agreement was consummated, but, rather, understood that the line would serve both a system of passenger transportation as well as interstate freight, and the City agreed to be bound by the RLA.[8] Taking into consideration the obligation to maintain the line, the regular use by SIRT for movement of interstate freight, the physical connection of the line to an interstate system of transportation, and the contractual understandings of the parties, we are of the view that the ICC properly ruled that SIRTOA is not exempted by the electric railway proviso.
 
 B. Collateral Estoppel
 
 42
 Appellants argue that if this court upholds the ICC order, the district court's decision should nonetheless be reversed because the state court's final judgment in Staten Island Rapid Transit Operating Authority v. International Brotherhood of Electrical Workers, 57 A.D.2d 614, 393 N.Y.S.2d 773 (2d Dep't 1977) that SIRTOA employees may be enjoined from striking bars the federal court from ruling otherwise. We disagree.
 
 
 43
 For a prior adjudication to have preclusive effect, there must be identity of parties (or their privies) in both actions. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 & n. 7, 99 S.Ct. 645, 649 & n. 7, 58 L.Ed.2d 552 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."); see also Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); Hansberry v. Lee, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940). In this case, of the plaintiffs before the district court, one--the Brotherhood of Locomotive Engineers (BLE)--was not a party to the state court proceedings. The district court concluded that to apply the state court judgment to some parties but not to others would constitute "inequitable administration of the laws," Restatement (Second) of Judgments Sec. 28(2) (1980), as it would permit strikes by some SIRTOA workers but not by others. We find this conclusion in accordance with applicable principles of law under Parklane and Blonder-Tongue.
 
 
 44
 Appellants press the argument, rejected by the district court, that the BLE employees were, in essence, "privies" of the Systems Federation employees who were parties to the state action, because the unions enjoyed an "affinity of interest" and because BLE had had an opportunity to intervene in the state proceedings but chose not to. We find this argument unpersuasive. Appellants' position unduly stretches the concept of privity, which would appear to require a much stronger link between the parties and their "privies" than exists herein. Cf. Price v. Worldvision Enterprises, Inc., 455 F.Supp. 252, 259 (S.D.N.Y.1978) (For purposes of judicial finality, "[p]rivity is defined as 'mutual or successive relationship to the same rights of property.' ") (quoting Litchfield v. Goodnow, 123 U.S. 549, 550-51, 8 S.Ct. 210, 211, 31 L.Ed. 199 (1887)), aff'd, 603 F.2d 214 (2 Cir.1979); see also 1B J. Moore & T. Currier, Moore's Federal Practice p 0.411 at 1255 (2d ed. 1965) ("privies" in context of judicial finality doctrine generally means "concurrent relationship to the same right of property; successive relationship to the same right of property; or representation of the interests of the same person.").
 
 
 45
 Nor do we find convincing appellants' assertion that BLE's opportunity to intervene in the state action binds them in federal court to the judgment issued in the state court. As a general rule, a nonparty is not obligated to intervene in a pending action simply because the litigation presents matters affecting the nonparty. See Chase National Bank v. City of Norwalk, 291 U.S. 431, 441, 54 S.Ct. 475, 479, 78 L.Ed. 894 (1934); see also Bigelow v. Old Dominion Copper Mining & Smelting Co., 225 U.S. 111, 126, 32 S.Ct. 641, 642, 56 L.Ed. 1009 (1912) (person's interest in determination of legal question or in establishment of a legal precedent that could later affect party's liability insufficient to create estoppel). We therefore conclude that the district court properly refrained from applying collateral estoppel since the requisite identity of parties (or their privies) was not present.
 
 
 46
 The district court rejected appellants' collateral estoppel argument also on the ground that the ICC decision constituted "an intervening change in the applicable legal context," Restatement (Second) of Judgments Sec. 28(2)(b) (1980), which served to erode the foundation of the state court decision. We agree that the intervening ICC decision made collateral estoppel inappropriate here. In determining whether to give collateral estoppel effect to a state court judgment, a federal court must consider, inter alia, "whether controlling facts or legal principles have changed significantly since the state-court judgment; and ... whether other special circumstances warrant an exception to the normal rules of preclusion." Montana v. United States, 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). In our view, the ICC determination that SIRTOA does not fall within the electric railway proviso of 45 U.S.C. Sec. 151 First was such a change or special circumstance. We therefore affirm the district judge's decision not to give collateral estoppel effect to the state court judgment.
 
 C. Preemption
 
 47
 Finally, appellants urge this court to hold that, even conceding RLA coverage, upon exhaustion of the procedures required by the RLA, federal law should not be applied to enjoin application of the Taylor Law to SIRTOA employees. They premise this argument on the peculiarly local state interest in preventing strikes by public employees and the railway's minimal connection with interstate commerce. We find this position incompatible with applicable precedent, e.g., United Transportation Union v. Long Island Railroad Co., 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982) (UTU v. LIRR ); California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957), and hold that the RLA preempts application of the anti-strike provisions of the Taylor Law to SIRTOA employees.
 
 
 48
 In UTU v. LIRR, the Supreme Court held that the Tenth Amendment did not prohibit application of the RLA to the LIRR, a state-owned railroad engaged in interstate commerce. In this recent ruling, the Court observed that "[o]peration of passenger railroads, no less than operation of freight railroads, has traditionally been a function of private industry, not state or local governments," id. at 686, 102 S.Ct. at 1354, and therefore federal regulation of such operations did not encroach upon traditional state functions. The Court noted further that "there is no justification for a rule which would allow the States, by acquiring functions previously performed by the private sector, to erode federal authority in areas traditionally subject to federal statutory regulation." Id. at 687, 102 S.Ct. at 1355. Railroad labor relations, the Court pointed out, is just such an area. See id. In holding that the RLA, and not the Taylor Law, governed labor relations between the LIRR and its employees, the Court added:
 
 
 49
 [A] State acquiring a railroad does so knowing that the railroad is subject to this longstanding and comprehensive scheme of federal regulation of its operations and its labor regulations.... Here the State acquired the railroad with full awareness that it was subject to federal regulation under the Railway Labor Act.
 
 
 50
 Id. at 689-90, 102 S.Ct. at 1356 (citing California v. Taylor, 353 U.S. 553, 568, 77 S.Ct. 1037, 1045, 1 L.Ed.2d 1034 (1957)).
 
 
 51
 We find this reasoning applicable herein, and conclude that the Taylor Law's anti-strike provisions are preempted by the panoply of remedies available for resolving labor disputes pursuant to the RLA, including resort to self-help upon exhaustion of RLA procedures, see UTU v. LIRR, 455 U.S. at 482-83, 102 S.Ct. at 1351; see also Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 377-80, 89 S.Ct. 1109, 1114-16, 22 L.Ed.2d 344 (1969). Indeed, when the City acquired the St. George/Tottenville line, it did so knowing that the RLA would govern labor relations with employees operating the line.
 
 
 52
 Appellants argue nonetheless that, even if the RLA governs, it is not preemptive once the statutory procedures are exhausted. We find this position inconsistent with applicable law. In California v. Taylor, for example, the Supreme Court concluded that the RLA, if applicable, would preempt the state's civil service law. The Court stated:
 
 
 53
 Congress apparently did not discuss the applicability of the Railway Labor Act to a state-owned railroad .... When Congress wished to exclude state employees [from coverage by federal labor law], it expressly so provided. Its failure to do likewise in the Railway Labor Act indicates a purpose not to exclude state employees.
 
 
 54
 353 U.S. at 563-65, 77 S.Ct. at 1043-44. In our view, this precedent compels the conclusion that application of the Taylor Law in the present context would be inconsistent with rights guaranteed by federal law, and is thus preempted thereby.[9]
 
 
 55
 Having considered all of appellants' arguments, we affirm the ruling of the Interstate Commerce Commission, and the decisions of the district judge, including the relief awarded pursuant thereto.
 
 
 56
 No costs.
 
 
 
 [1]
 A substantial number of SIRT employees elected to do so. 360 I.C.C. at 469. Section 13 of the contract reads, "Except as provided in Section 6(d) above with respect to the Transferred Employees this Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of New York." (emphasis added)
 
 
 [2]
 In the same order, the Commission dismissed as mooted by the decisions in Finance Docket Nos. 26342 and 26343, a previous complaint brought by the Brotherhood of Locomotive Engineers, which alleged that SIRT was about to enter into agreements with the MTA which, if not approved, would violate former section 5(4) of the ICA (recodified at 49 U.S.C. Sec. 11348 (Supp. V 1981) and deprive SIRT employees rights under ICA former section 5(2)(f) (recodified at 49 U.S.C. Sec. 11347 (Supp. V 1981)). Finance Docket No. 25717
 
 
 [3]
 The plaintiffs in 78 C 2083 were the Brotherhood of Locomotive Engineers, Brotherhood of Railway Signalmen, International Association of Machinists and Aerospace Workers, United Transportation Union and Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees; the plaintiff in 78 C 1931 was System Federation No. 1, Railway Employees' Department, AFL-CIO, representing different employees. Both actions are on consolidated appeal in this court, Dkt. No. 82-7925
 
 
 [4]
 Interstate Commerce Act, 49 U.S.C. Sec. 1(2)(a) read, in pertinent part: "[The provisions of this chapter] shall not apply--(a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States ...." (recodified at 49 U.S.C. Sec. 10501(b) (Supp. V 1981))
 
 
 [5]
 That it is the City and not SIRTOA that acquired the line is of no legal significance. Since SIRTOA is the City's authorized operator of the line and was formed for the express purpose of taking over the line, it may be deemed an arm of the City for the purposes appropriate herein
 
 
 [6]
 Appellant concedes that SIRTOA falls within the first criterion of Sec. 151 First--i.e., that it is "directly or indirectly owned or controlled by or under common control with any carrier by railroad." Br. for Appellant at 15
 
 
 [7]
 The Commission observed:
 SIRT as holder of trackage rights permitting it to operate on the line jointly with the city or the city's authorized representative had and now has no implicit obligation to maintain the trackage either under historical Commission precedent or under the agreement effected between the city and SIRT, as approved by the Commission. Indeed that agreement is conditioned to require prior execution of the trackage rights arrangement .... This arrangement commits the city to maintain, repair, and renew the trackage facilities and maintain them in a reasonable [sic] good condition for the operation of freight trains (by SIRT).
 
 
 [360]
 I.C.C. at 473
 
 
 [8]
 In addition, the Commission found that another fact would have served as an independent basis on which to allow SIRTOA employees formerly employed by SIRT to bring complaints before the ICC. The Commission stated:
 Even if SIRTOA had been determined not to be a carrier within the meaning of Section 1, First of the RLA, we might otherwise have entertained a complaint by any one of the former employees of SIRT now employed by SIRTOA, premised on a violation of the terms of our decision of April 21, 1971. That decision directed that no changes or modifications were to be made in the terms and conditions approved in the decision without prior authority from this Commission. One of the terms imposed in that decision was the subjection to conditions for the protection of affected employees as submitted in the agreements of record. That responsibility is not to be superficially construed.
 
 
 [360]
 I.C.C. at 476
 
 
 [9]
 Appellants also claim that the district court violated the federal anti-injunction statute, 28 U.S.C. Sec. 2283 (1976), when it enjoined enforcement of the permanent anti-strike injunction issued by the Appellate Division. Since we conclude that the district court's decision was "to protect and effectuate" its judgment of February 9, 1979, and was "necessary in aid of its jurisdiction" to review the ICC ruling, see id., we reject this argument